## WILLIAM JOHNSON V. STATE.

No. 288. Opinion Filed October 24. On Rehearing November 9.

(97 Pac. 1059.)

1. JUDGMENT—Modification—Vacation—Time—New Trial. First. If it appears to the trial court, after overruling a motion for a new trial or a motion in arrest of judgment, that there was irregularity in obtaining the judgment, it may, of its own motion, modify or set aside its order overruling the motion for a new trial or the motion in arrest of judgment. This may be done at the term of the court at which the order was made; but after final judgment has been rendered, and the term has expired, there must be a substantial compliance with the statute, to give the court further jurisdiction.

Second. When the trial court grants a motion for a new trial upon the ground of irregularities in obtaining the verdict, it is not necessary for the court to pass upon a motion in arrest of judgment, and the case stands for trial, just as if no verdict had been rendered therein.

2. INDICTMENT—Decedent—Weapon—Description. First. Where an indictment charges the defendant with the murder of "Mary Cuppy," it is not necessary to allege that "she" was a human being, this being a matter of proof, rather than of pleading.

Second. Where an indictment for murder alleges that the wounds that caused death were inflicted with "a piece of two-inch plank," or "an ax handle," it is not necessary to allege that these instruments were deadly weapons, or to give their size, weight, or dimensions.

3. CONTINUANCE—Absent Witnesses—Time to Prepare for Trial—Application—Discretion—Review. First. When an application for a continuance fails to give the names of absent witnesses, or to state the facts that defendant expects to be able to prove if a continuance is granted him, it is fatally defective.

Second. When an application for a continuance is based upon the ground of want of time in which to prepare for trial, and it appears that the indictment against defendant has been pending for six or seven weeks during which time the defendant has been represented by counsel, the application is addressed to the sound discretion of the court, and his action is not subject to review, in the absence of a showing of abuse of this discretion.

4. JUDGES—Change of Judge—Jurisdiction—Trial—Objections—Appeal—Presumption of Regularity of Court Proceedings. First. Under the statute, but one change of judge can be had.

Second. The fact that the regular judge of a district may hold court in the same district and at the same time that a special judge is trying a case, in no manner affects the jurisdiction of the special judge to try such case.

Third. Objections to alleged errors, committed during a trial, must be made in apt time, so as to allow the trial court to rule upon the objections before action is taken. It is too late to complain after the trial is ended.

Fourth. Every presumption must be indulge in in favor of the regularity of the proceedings of a court of record, and the burden is upon the party who would impeach that regularity to do so by the best evidence obtainable.

5.    VENUE—Change—Discretion—Burden of Proof—Evidence. First. An application for a change of venue is addressed to the sound discretion of the trial judge, and, in the absence of an abuse of this discretion, his judgment is not subject to review.

Second. The burden is upon the defendant to clearly show, upon an application for a change of venue, his inability to obtain a fair and impartial trial in the county in which the offense was committed.

Third. See facts in opinion of court, which did not constitute a sufficient showing to warrant a change of venue.

6.    JURY—Competency—Examination—Challenge—Statutes. First. The fact that a juror states, on his voir dire examination, that he has previously sat as a juror upon the trial of a murder case, does not render him subject to challenge upon the ground of implied bias.

Second. The court must be clearly satisfied of the fairness of a juror, and his freedom of prejudice or bias against the defendant, or he should be excluded from the jury.

Third. The court is not bound by the answers of a juror on his voir dire examination, but may take such other means as may be necessary to determine the competency of the juror.

Fourth. The enumerated causes for challenges in the statute are not exclusive of all other causes not enumerated.

Fifth. When a juror has an opinion as to the guilt of the defendant, based upon rumor or from reading the public press, and the court is satisfied that the opinion is such that it will not combat the evidence or resist its force, such opinion, of itself, will not render the juror incompetent to sit in the case.

Sixth. The court should resolve all doubts as to the competency of the juror in favor of the defendant.

Seventh. It was proper to allow counsel for defendant to inquire as to what was the verdict rendered by the jury, of which the juror Willis had formerly been a member, in order that they might intelligently exercise their peremptory challenge.

7.    APPEAL—Review — Objections — Evidence — Presentation. When a defendant seeks a new trial upon the ground that the trial court erred in the admission of evidence against him, his counsel should, in their presentation of this ground for a new trial to this court, point out the alleged improper evidence objected to, and also give the names of the witnesses. and so directly call the attention of this court to the ground of the objection that the error, if any, can be passed on intelligently; otherwise this court would not know what.

8.    APPEAL—Review—Instructions—Errors Must be Specified. In support of a motion for a new trial, upon the ground that the court erred in refusing to give the instructions requested by the defendant. particular objection counsel was relying upon.

or in misdirecting the jury as to the law of the case, counsel for defendant should, in their presentation of this ground, point out the specific errors complained of.

9. **FORMER JEOPARDY—Plea—Striking from Record. First.** When a defendant has been tried and convicted of an offense, and a new trial has been granted him, and, upon his being placed upon trial on the same indictment again, a plea of former jeopardy, based upon the first conviction, does not present a defense in the case.

Second. When a plea of former jeopardy does not state facts which constitute a defense, it is not error for the trial court to refuse to direct the jury to find a special verdict on such plea, but it should be stricken from the record of the case.

10. **MURDER—Capital Punishment.** See facts stated in opinion, which sustain a verdict of guilty of murder with capital punishment. (Syllabus by the Court.)

*Error from District Court, Pottawatomie County; B. B. Blakeney, Special Judge.*

William Johnson was convicted of murder, and he brings error. Affirmed. Rehearing denied.

On the 26th day of March, 1908, William Johnson (who will hereafter be called "the defendant") was indicted in the district court of Pottawatomie county for the murder of Mrs. Mary Cuppy. On the 6th day of April thereafter, the case was reached for trial. The following proceedings were had: A jury was empaneled, and the defendant entered the plea of guilty. The court submitted the case to the jury upon this plea alone, and the jury found defendant guilty of murder, and assessed his punishment at death. Counsel for defendant filed a motion for a new trial and also for arrest of judgment. These motions were over-ruled by the court, and defendant was duly sentenced to be hanged. Defendant began to take steps to bring the case to the Supreme Court by writ of error, but they were never perfected.

Sections 5588 and 5589, Wilson's Rev. & Ann. St. Okla. 1903, are as follows:

"The judge of a court at which a conviction requiring a judgment of death is had, must, immediately after the conviction, transmit to the Governor, by mail or otherwise, a statement of the conviction and judgment, and of the testimony given at the trial.

"The Governor may thereupon require the opinion of the Judges of the Supreme Court or any of them, upon the statement so furnished."

In accordance with these statutes, the judge that presided at the trial caused a certified copy of the judgment and proceedings had on the trial to be forwarded to the Governor of the state. In accordance with the statute, the Governor required the opinion of the Supreme Court. The Supreme Court held that the conviction of the defendant was irregular. (This opinion is published *ante*, p. 154, 21 Okla. 40, 96 Pac. 26).

This opinion was handed down on the 6th day of May, 1908. At this time the defendant had not perfected his appeal to the Supreme Court. The district court was still in session in Pottawatomie county. Upon being advised that the Supreme Court had decided that the conviction of the defendant was irregular, the judge of the district court of Pottawatomie county, on his own motion, set aside his orders overruling the motions of defendant for a new trial, and in arrest of judgment, and then sustained the motion for a new trial, but took no further action on the motion in arrest of judgment. All this was done over the objections and exceptions of counsel for defendant.

Defendant was again placed on trial for the offense charged in the indictment, and was again found guilty by the jury, and his punishment assessed at death. An appeal was taken to the Supreme Court to review this judgment of conviction, and was pending in said court when the Criminal Court of Appeals was created. The case was then transferred to this court, as the statute directs. The facts of the case are sufficiently stated in the opinion of the court.

*C. G. Pitman* and *A. M. Baldwin*, for appellant.—

On the question of description of deceased in indictment: Anderson's Law Dictionary, p. 513; 1 Wilson's Rev. & Ann. St. 1903, p. 593; *Commonwealth v. Macloon*, 101 Mass. 6-8.

On the question of change of judge: Session Laws 1903, p. 221; *Garrison v. Territory,* 13 Okla. 692; *People v. Hubbard,* 22 Cal. 35.

On the question of change of venue: Session Laws 1903, p. 220; *Garrison v. Territory,* 13 Okla. 690; *State v. Olds,* (Oreg.)· 24 Pac. 394; *Edwards v. State,* 25 Ark. 444; *People v. Yoakum,* 53 Cal. 566; *Higgins v. Commonwealth,* (Ken.) 21 S. W. 231.

On the plea of former conviction: Wilson's Rev. & Ann. St. 1903, § 5534; *People v. Fuqua,* 61 Cal. 377; *People v. Heilbing,* 59 Cal. 567.

ˋ *Charles West,* Attorney General, and *W. C. Reeves,* Assistant Attorney General, for the state.—

On the sufficiency of indictment for murder: *Walcher v. Territory,* 18 Okla. 528. Requisite description of deceased: Wharton on Homicide, 3rd Ed. (Bowlby) p. 865. note 39 and citations; *Bowers v.State,* 122 Wis. 163; *Ogden v. State,* 15 Tex. App. 454. Requisite description of weapon: 2 Bishop's New Crim. Proc., § 514 and citations. .

On the question of a second change of judge: Constitution, art. 7, sec. 9; Session Laws 1903, c. 25, art. 1, sec. 1.

On the question of change of venue: 1 Bishop's New Crim. Proc., sec. 71, par. 5, and citations; 12 Cyc. 243, note 56 and citations.

On the plea of former conviction: Wilson's Rev. & Ann. St. 1903, § 5556; 1 Bishop's Crim. Law (4th Ed.) § 844; *Martha v. State,* 26 Ala. 72; *Simeo v. State,* 9 Tex. App. 338; *Johnson v. State,* 34 Tex. Crim. Rep. 115; *Ellis v. State,* 25 Fla. 702; *State v. Lee,* 46 La. Ann. 623; *State v. Hite,* 9 Yerg. (Tenn.) 357; *State v. Haynes,* 36 Vt. 667.

On the question of court's action on granting new trial: Wilson's Rev. & Ann. St. 1903, § 4760; 29 Cyc. 1028; *List v. Jockhick,* 59 Kan. 143; *Huber Mfg. Co. v. Sweeney,* 57 Ohio. St. 169, 173; *Slocum v. Fairchild,* 7 Hill (N. Y.) 292; *Snow v. Vandeveer,* 33 Neb. 735; *Coffield v. Warren,* 72 N. C. 223; *Watson v. Williamson* (Tex.) 76 S. W. 793.

FURMAN, Presiding Judge. (after stating the facts as above). The court has had the benefit of able and exhaustive briefs and oral argument in behalf of both the defendant and the state. The record in this case contains 810 pages. Several hundred exceptions were reversed during the trial. In view of the supreme importance of this case, all of these exceptions have received careful consideration; but as it would fill a large volume to discuss them in detail, we will confine our discussions to those that go to the substantial merits of the case, and to such others as present questions of practice, which should be settled in this state. We will consider them in the order in which the matters complained of arose during the trial in the court below.

First. The defendant complains of the action of the trial court in reconsidering and setting aside, of its own motion, its former action in overruling defendant's motion for a new trial, and also the motion in arrest of judgment and in then sustaining said motion for a new trial, upon the ground that the action of the court in formerly overruling said motions was *res judicata.* In support of this contention, defendant cites section 4760, (Wilson's Rev. &. Ann. St. 1903,) in the Oklahoma Statutes, which is as follows:

"The district court shall have power to vacate or modify its own judgments or orders, at or after the term at which such judgment or order was made: First, By granting a new trial for the cause, within the time and in the manner prescribed in section two hundred and ninety-nine. Second, By a new trial granted in proceedings against defendants constructively summoned, as provided in section seventy-eight. Third, For mistake neglect or omission of the clerk, or irregularity in obtaining a judgment or order. Fourth, For fraud, practiced by the successful party, in obtaining the judgment or order. Fifth, For erroneous proceedings against an infant, or a person of unsound mind, where the condition of such defendant does not appear in the record, nor the error in the proceedings. Sixth, For the death of one of the parties before the judgment in the action. Seventh, For unavoidable casualty or misfortune, preventing the party from prosecuting or defending. Eighth, For errors in a judgment shown by an infant in twelve months after arriving

at full age, as prescribed in section four hundred and four. Ninth. For taking judgments upon warrants of attorney for more than was due to the plaintiff, when the defendant was not summoned or otherwise legally notified of the time and place of taking such judgment."

It is true that in the cases *of Lookabaugh v. Cooper*, 5 Okla. 102, 48 Pac. 99, and *Long v. County Commissioners*, 5 Okla. 128, 47 Pac. 1063, the Supreme Court of Oklahoma Territory did announce the doctrine that:

"In the absence of a showing of irregularity, fraud, unavoidable casualty or misfortune, the district court has no power to set aside its order overruling a motion for a new trial, upon a reconsideration of the same motion already passed upon, and a reversal of such order can be had only by proceedings in error in the Supreme Court."

But we are of the opinion that the principle announced in these cases is not applicable to the case at bar. By the express terms of the statute relied upon, the trial courts have power to vacate or modify their own judgments or orders, at or after the term at which such judgment or order was made, and grant a new trial for "irregularity in obtaining a judgment." In the opinion of the Supreme Court referred to in the statement of this case, it was said: "We are of the opinion that there are such irregularities disclosed by the record that we cannot say that the defendant was convicted according to the forms of law." We concur in all that was said by Mr. Justice Dunn in this opinion. When the opinion of the Supreme Court was presented to the trial court, at the same term at which the order was made, and the irregularities in obtaining the judgment were pointed out, it was the duty of the trial court, on its own motion, to set aside its order overruling appellant's motion for a new trial and in arrest of judgment. There was, therefore, no error in this action. We are fully sustained in this view by the Supreme Court of Oklahoma in the case of *McAdams v. Latham*, 21 Okla. 611, 96 Pac. 584. In this case Chief Justice Williams said:

"A trial court has a very wide and extended discretion in setting aside and modifying proceedings had in its own court, if

it does so at the same term at which the proceedings were had; but after final judgment has been rendered, and the term expires, there must be a substantial compliance with the statute to give the court further jurisdiction."

The trial court then sustained defendant's motion for a new trial, but did not take further action on the motion in arrest of judgment, and, indeed, could not have properly done so, as there was then no judgment to arrest; and the case stood on the docket of the court, just as if there had been no trial.

Second. Defendant challenges the sufficiency of the indictment, because it described the instruments with which the homicide was committed as "a piece of two-inch plank and an ax handle." The contention of defendant is that the size and weight of the piece of plank and the ax handle should have been set out in the indictment, or that it should have been alleged that they were deadly weapons. Reason and authority are against these contentions. Suppose that it had been alleged that defendant had choked the deceased to death, either with his fingers or with a piece of string or cloth. Would it have been necessary to give the size of and the weight of his fingers, or of the string or cloth, or to have alleged that they were deadly weapons? Clearly not. The death of the deceased conclusively shows the deadly character of the instruments used.

In the case of *Drye v. State,* 14 Tex. App. 191, this very question came up and the court said: "The particulars of the weapon—as that it was of such a length and breadth—need not be given; to say, for example, that it was 'a certain wooden stick' will suffice." The court then cites a number of cases supporting this proposition.

In *Jeffries v. Commonwealth,* 84 Ky. 238, 1 S. W. 442, the court says:

"The objection that the indictment fails to state the pistol was a deadly weapon, and was at the time loaded with a leaden ball or other hard substance, cannot be sustained; for the shot could not have been fired, nor a fatal wound inflicted thereby, if the pistol had not been a deadly weapon and loaded. A formal statement of these facts was not, therefore, indispensable."

In *State v. Smith,* 61 N. C. 340, the court held that an indictment was sufficient when it alleged that death was inflicted with "a certain wooden stick."

Bishop's New Criminal Procedure, vol. 2, § 514, is as follows:

"The particulars of the weapon, as its length and breadth, need not be given; thus it suffices to say that it was a wooden stick. * * * It need not be added that the weapon was dangerous or deadly."

We believe that these precedents are right in principle, and they will be adopted and followed by this court.

Counsel for defendant also contends that the indictment is defective because it does not allege that the deceased, Mary Cuppy, was a human being. It is true that our statute defines homicide to be "the killing of one human being by another," but this does not mean that the indictment must allege that the person killed or the person doing the killing were, either or both, human beings. An indictment is understood according to the import of the common language used therein. It is true that in some instances the name of a human being is given to brutes, but this is so unusual as not to affect the rule of law that the use of the name of a human being imports a human being. When a name, usually applied to human beings, is used in a deed or in any legal document, is it necessary to allege the possessor of that name is a human being? Certainly not. As to whether a human being or a brute was killed, is a matter of evidence and not one of pleading.

Our views upon this question are well expressed by the Supreme Court of Wisconsin, in *Bowers v. State,* 122 Wis. 163, 99 N. W. 447:

"It is said that this charge is insufficient, because it does not allege that the plaintiff in error murdered a 'person' or a 'human being.' The ingenuity of the point is only excelled by its absurdity. An allegation of the murder of George Bowers, Sr., is an allegation of murder of a person, under all reasonable rules of construction of language."

There is no safer or higher authority on Criminal Law than Mr. Wharton. In the third edition of his great work on Homicide, page 865, he says: "An indictment for a homicide of a named

person need not aver that he was a human being, that fact appearing from the name." The following authorities are to the same effect: *Palmer v. People,* 138 Ill. 356, 28 N. E. 130, 32 Am. St. Rep. 146; *State v. Stanley,* 33 Iowa, 526; *Merrick v. State,* 63 Ind. 327; *Ogden v. State,* 15 Tex. App. 454.

Therefore, upon reason and authority, we hold that it is not necessary for an indictment for murder, which gives the name of a human being to the deceased, to go further and allege that the deceased was a human being; and also that it is not necessary to give the dimensions and weight of the instrument with which death is inflicted, or to allege that it was a deadly weapon.

Third. Defendant contends that there was error in overruling his application for a continuance. The record shows that the indictment in this case was returned against defendant in the district court of Pottawatomie county on the 26th day of March, 1908, charging him with the murder of Mary Cuppy, on the 23rd day of January, 1908, that on March the 30th, it being made to appear to the court that the defendant was without funds to employ counsel, the court appointed C. G. Pitman, an attorney of that bar, to defend him; that on the 6th day of April this case was called for trial; that the defendant then entered the plea of guilty to the charge of murder, and that the proceedings were had which are set out in the statement of this case; that on the 6th day of May, 1908, the Supreme Court held that the judgment against defendant, upon his plea of guilty, was irregular; that in conformity with this opinion the trial court, on the 9th day of May, sustained a motion for a new trial, and set the case down for retrial on the 12th day of May. The application for a continuance does not state the name of a single absent witness whose presence he desired to obtain; neither does it state a single fact which defendant expected to be able to prove, if a continuance was granted him. The nearest approach to anything of the kind is the following statement in the application:

"The defendant believes, if the trial of this cause is continued until the next term of the court, defendant's relatives will

assist him and will afford him means, by which he can properly prepare his defense in support of which a certain letter is hereto attached and made a part of this application."

No such letter is in the record. The record shows that defendant had the assistance of counsel from March 30, 1908; and we wish to express our high appreciation and commendation of the zeal and ability with which this defense has been conducted. Everything which human ingenuity could suggest has been done by counsel for defendant. Aside from the manifest insufficiency of the application for a continuance, this court feels confident that if a single witness had been in existence whose testimony could have been in the least beneficial to defendant, the industrious, zealous, and able counsel who represented him would have made that fact appear in the motion for a continuance. The record of the trial also shows that no injustice was done defendant in overruling his application for a continuance, for the reason that the homicide occurred at a place near where the trial was had, and that every witness who could have known anything about the matter either testified in the case, or was easily accessible to the process of the court if his presence and testimony had been desired by defendant. This court is satisfied that all of the material facts of this case were before the jury, and are in the record now. For all of these reasons, this court holds that the trial court did not err in refusing to grant a continuance in this cause.

Fourth. Defendant contends that the special judge, B. B. Blakeney, was without jurisdiction to try this case for two reasons: First. That appellant had filed a motion for a change of judge from said special judge. Second. That the regular district court of the Fourth judicial district was sitting in and for Pottawatomie county, and was in session during a part of the time that the trial of defendant was in progress, and that, therefore, the trial of this defendant by the special judge was contrary to law.

The first contention of counsel, under this head, is disposed of by the plain language of the very statute which prescribes for a change of judge. Section 1 of article 1 of the Session Laws of

Oklahoma of 1903, p. 220, c. 25, says: "Provided that not more than one change from the county, and one change from the judge shall be allowed." The court was therefore without power to grant the motion for a change of judge, it appearing from the record that Hon. B. B. Blakeney, who tried this case as special judge, was doing so on account of the fact that defendant had already taken a change of judge from Hon. Wm. Maben, the regular judge of that district.

The second contention, that the regular judge of the district was holding court in the same county, and during the time that the special judge was trying defendant, is without support in the record. It is asserted in the motion for a new trial only, and again in the motion for an arrest of judgment. These motions are signed by counsel for defendant, but neither of them is supported by affidavit. Every presumption must be indulged in, in favor of the regularity of the proceedings of courts of record, and the burden is upon the party who would impeach that regularity to show the alleged irregularity by the best evidence in his power. This should have been done by the record evidence of the fact. But even if it had been shown that the regular judge of that district was holding court at the time of this trial in the same county, and this objection had been made in apt time, this would not have affected the powers of the special judge. Again, the record does not show that any objection was made to this matter by defendant until after his conviction. It was then too late to complain. Objections should be made promptly, so that, if error is about to be committed, it may be avoided.

This precise question has been passed upon by the Supreme Court of Kansas in the case of *List v. Jockheck,* 59 Kan. 149, 52 Pac. 422. The court said:

"If the record showed that the plaintiff had objected to this division of judicial authority, it would present a serious question; but it does not appear that such objection was made; besides, the question may well arise as to which of these judges was rightfully in the exercise of the authority to hold court. It would seem that, if the proceedings of either one should be declared void or even erroneous it would be the proceedings before the

regular judge. He, having knowledge of his disqualification to try the case in question, and having given away for its trial before a judge pro tem., should take notice of the fact that he was temporarily out of the exercise of his judicial authority, and should know that, until the business which justified his temporary retirement from the exercise of his functions had been dispatched, he was disqualified from holding his court. In the interim his judicial authority would be in suspension, so that, if objection had been made by the litigating parties, that authority could not have been exercised."

This decision appeals to our judgments as being sound in principle, and even if the provisions of our laws were as restrictive as those of Kansas are, we would follow it. But our Constitution, in section 179 (Bunn's Ed., p. 47, Const. art. 7, § 10), in express terms says: "Two or more district judges may sit in any district separately at the same time." From this it is clear that the regular judge, and as many special judges as may have been appointed or selected, may sit separately in the same district at the same time. So the grounds relied upon by the defendant, as showing want of jurisdiction in the special judge who tried this case, are without merit. While this court is required, by statute, to refer questions involving a construction of the Constitution of the state to the Supreme Court for decision, this provision of the Constitution is so plain and direct as not to admit of controversy. But, be that as it may, for the reasons given, this court holds that the powers of the special judge to try this case could not be abrogated or interfered with by anything that the regular judge may have done during the trial of this cause, even if such action had properly appeared in the record.

Fifth. Defendant complains of the action of the trial court in not granting his application for a change of venue. This application was regular in form, and was attested by the necessary number of corroborating witnesses. It was contested, and a number of counter affidavits were filed on behalf of the state. When it came on to be heard, the county attorney placed the following witnesses on the stand, all of whom had joined with defendant in his motion for a change of venue:

John Williams, who testified that he had lived in and near to Tecumseh off and on for four or five years, and that he was a farmer; that he was in Tecumseh the night that defendant was arrested; that he had gone to Shawnee since, and had also been out in the country near Shawnee, since, and also to Sewell, to a negro settlement; that while in Shawnee he had been around on the streets and among the colored people; that he had heard some colored people say that they would not give defendant a fair and impartial trial, and he had heard some white people say the same thing; that all that he heard to this effect was in Shawnee, Sewell, and Tecumseh. He was then asked this question: "Do you know anything about the feeling, generally, in this county, toward the defendant?" Answer: "No, only for myself." He testified that he thought that defendant could not get a fair and impartial trial on account of the prejudice of the people, and that he had heard a great many persons say so in the places where he had been, but did not know where these people lived. That he had heard this in passing people in the street, and supposed that they were talking about this case, but did not know it—they might have been talking about some other case. He also stated that he did not know whether this feeling had subsided or was still existing. On cross-examination he said that on the night of the arrest of defendant a mob came and tried to get defendant, and that defendant had been tried and sentenced to be hung; that these facts had been generally talked about around the county; that he knew this from what he had heard at the different places to which he had been; and that, in his opinion, defendant could not get a fair and impartial trial in Pottawatomie county. On re-direct examination, he testified that he had not seen anything since the mob came, which led him to believe that defendant could not get a fair and impartial trial in the county. The court then examined the witness, and he testified that he left Shawnee on the 10:30 interurban car on the night that defendant was arrested; that the car was full of people, and they were standing on the steps, and some were hanging on;

that no one offered any violence to him; that the passengers were from 15 years of age to 35. They said they were coming over to Tecumseh to get Will Johnson; that when they reached Tecumseh they went to the jail. He heard some one say, "Bring him out!" That in his judgment there were a hundred or more persons there.

The next witness was Pauline Hayden. She testified that she had lived in Tecumseh for four or five years; that she lived at the oil mill, and had not been out in the country or mixed with white people much. She was asked, "Then you don't know anything about the feeling generally, in the county, about this defendant?" and answered, "No, sir; I don't know anything about the feeling." Question: "You just think so?" Answer: "Yes, sir." She said that she did not see the mob, but heard of it, and that she thought this would create a feeling against him, but did not know any thing about it; that she had never heard any one so express themselves, but she believed it. On cross-examination she testified that she had heard that defendant had been taken out of the county to keep the mob from getting him; and had also heard that he had been tried, and sentenced to be hung; that she had heard the matter discussed by colored people, but had never heard it talked of by white people Examined by the court, the witness testified that she did not think that the white people would give a colored man a fair and impartial trial when he was charged with the killing of a white man, or woman, in the county where the offense was committed, but that they would do so in some other county.

Rebecca Williams testified that she lived in Tecumseh and had lived there since last Christmas; that she goes to Shawnee sometimes; that she had heard both colored and white people talk about this case in Tecumseh and Shawnee. She heard some white people say that defendant had killed Mrs. Cuppy, and she heard some say they did not know whether he did it or not. "I heard some say they did not think he could get his trial." She said that she did not know anything about how the people of the

county felt about the defendant; and that she had heard of the former conviction, and sentence of defendant, and had heard people talking about these things, and had come to the conclusion that defendant could not get a fair and impartial trial in the county.

J. S. Brooks testified that for two years he had lived two miles south of Tecumseh, off and on, and also at Keokuk Falls since February; that he had heard people talking about this case on the streets of Tecumseh; that he knew nothing of how the people felt in the south or north end of the county. The witness stated that, in his opinion, a jury could not be obtained who had not formed an opinion. He also said: "Here is what I think about it: Of course, under this Constitution, we all voted for statehood, and from what I learned of it, we had an election, and we wasn't to have any hanging or execution. Of course, the law is in the hands of you men. This is how come me to sign this thing" (defendant's application for a change of venue). Then he was asked: "Why did you vote for that effect?" and answered, "My understanding was that there was not to be any hanging at all." The witness also testified that he had heard expressions on the street that defendant should be hung, and that the law was too slow in hanging him.

Earnest Amy testified that he lived southeast of Tecumseh; that he was in Tecumseh the night defendant was arrested; that he did not go around among the people but stayed at home, and that he knew nothing about the feeling of the people generally toward the defendant; and that he could not say whether the people could give defendant a fair trial or not. He had heard a lot of people say that defendant could not get a fair trial. Cross-examined, witness saw a mob formed; heard them say they would hang defendant if they could get him. He also heard the former trial, and knew the result. Thought defendant could not get a fair trial.

All of the above witnesses were corroborating witnesses of defendant in his application for a change of venue.

Defendant then offered the testimony of the examination of the jurors on *voir dire*. Defendant then called John Hatfield to support his application. The witness testified that he was a deputy sheriff, and had held this position for five years. He testified that a few people in Shawnee talked about forming a mob, and that some people came over to Tecumseh. Witness was in the jailyard, and was armed. The sheriff was in the yard, also. The defendant had been caried away from the jail by the sheriff; that with the school children taken out, the crowd around the jail would not amount to over 50 persons. No one drew a gun. One fellow got upon the fence, and witness pushed him off; that the men were from Shawnee and Tecumseh, and the immediate vicinity; that the defendant had been removed from the jail for about an hour before the crowd came; that the crowd appeared more curious than excited. Some were demanding admittance to the jail. The witness testified that he had been in every precinct of the county serving subpoenas, summonses, and so forth; that the witness had not seen or heard anything that would indicate that defendant could not get a fair and impartial trial in the county; that it was not true that the minds of the people of the county were prejudiced, and inflamed against defendant.

E. A. Price was called as a witness in behalf of defendant. He testified that he was sheriff of the county. Witness heard that there was danger of a mob, and had defendant conveyed to a place of safety. Witness further testified, "I was in the jail when about 70 persons marched up." That he carried several persons through the jail, and let them see that defendant was not there. Witness knew of defendant's conviction and sentence; that this had been published to some extent in the papers—had heard expressions that defendant ought to be hung. These expressions were freely made on the night of the homicide; that since that time he had not heard many people say so. On cross-examination the witness said that, from what he had heard and from what he knew of the sentiment of the people of the county, he did not think that there was such prejudice or bias existing in the county among the people as would prevent defendant from

receiving a fair and impartial trial in the county. On re-direct examination, witness said that a jury could be secured in the county who had never heard of the case; that the persons who came to the jail the night of the homicide were from that immediate vicinity; that they were acting under excitement; and that a number of them had come to witness since, and begged his pardon for what they had done, saying that they had acted under excitement at the time.

Steve Gage was placed on the stand by the defendant. Witness testified that he saw the men at the jail the night of the homicide; that he had heard the testimony of the sheriff, and his testimony was correct; that he heard people say defendant ought to be hung; saw an account of the previous conviction of defendant in a newspaper; and that all that he had heard about the case was from people around town.

Mr. Day, a bystander, was placed on the. witness stand by the state. He testified that he lived one mile north and four miles east of town; had met the people of the county at different places; there is no such prejudice existing among the people as would prevent defendant from getting a fair and impartial trial in the county. Cross-examined, the witness testified that he, at that time, had no opinion as to the guilt or innocence of defendant; that witness had heard friendly feelings expressed among the people toward defendant. Quite a number of them did not know whether he was guilty or not. A majority of the people do not think the defendant guilty.

L. M. Cummings, a bystander, called as a witness by the court, testified that he lived 18 miles northeast of Shawnee; was in town on business; had not come to attend the trial; that the case had not been discussed much in his neighborhood; had only heard two or three men speak of it; that the people of his section were not biased or prejudiced against defendant, and could give him a fair and impartial trial; witness had never heard of the previous conviction of defendant; had never heard either side of the case; lived at Belmont; was a merchant; was in position to

know whether there was prejudice against defendant; that but little had been said about the case in his section; and the people there were not prejudiced against defendant.

J. W. Hatfield, a bystander, called by the state, testified that he lived at McLoud; was a merchant; comes in contact with a great many. people; that the people of his section are not so prejudiced against defendant that they would not give. him a fair and impartial trial. Cross-examined by defendant: Had seen the account of the previous trial of defendant published in the papers; cannot say that the verdict of the jury was approved by the people; had never heard any one express himself.

The foregoing is the substance of the entire testimony introduced, with reference to the change of venue. We have gone into it fully, as we regard this as the most serious question in the case. Our Constitution guarantees to every one who is charged with a crime a fair trial before an impartial jury. The presumption of law is that a defendant can get a fair and impartial trial in the county in which the offense was committed. In order to overcome this presumption, the defendant must show, clearly, that this cannot be done. The applicantion for a change of venue is addressed to the sound discretion of the trial judge. He sits both as judge and jury, and determines all questions of law and fact that arise upon the hearing of the motion. His de- cision is not subject to review by this court unless an abuse of this discretion is made to appear. In this case the state examined, as witnesses, all of the parties who joined with defendant in his application for a change of venue. From their testimony it was made to appear that the minds of the people of Shawnee, Tecumseh, Sewell, and Keokuk Falls were inflamed against de- fendant to greater or less extent; but no such showing was made as to the people of the other portions of the county. It also appeared that the means of knowledge of all these witnesses was limited to their immediate localities, and that much of their testimony consisted in the expressions of their individual opinions The United States census for 1907 shows that there was at that time, 11,007 male persons, over the age of 21 years, residing in

Pottawatomie county.   We cannot hold that the trial judge abused his discretion in refusing to grant the change of venue on this testimony.   It does not even make a *prima facie* case, so far as the people of the entire county are concerned.

The Supreme Court of Minnesota, in the case of *State v. Stokley,* 16 Minn. 253 (Gil. 249), lays down what we conceive to be the correct rule on this subject.   It says:

"It has always been held that the inability to obtain a fair and impartial trial should be clearly established, and a *prima facie* case of undue feeling and excitement has been held insufficient, as easily established in most cases of crime, especially of a flagrant character."

After the corroborating witnesses of defendant were placed upon the stand, the defendant himself called the following witnesses in support of his application, viz.: John Hatfield, E. A. Pierce, and Steve Gage.   By so doing, .defendant made these parties his witnesses, and vouched to the court for their means of knowledge and credibility.   Each of these witnesses testified that there was no such prejudice in the county against defendant as would prevent his having a fair and impartial trial.   But this is not all.   A number of bystanders, living in different sections of the county, were placed on the witness stand by the court, and they testified that there had been little discussion of the case in their sections, and that the people of the county were not prejudiced against defendant.   We, therefore, cannot hold that the trial court erred in not granting defendant's motion for a change of venue.

Sixth.   Defendant complains of the rulings of the trial court in the selection of the jury.   Special objection is made to overruling the defendant's challenge to the juror J. P. Willis for implied bias.   It appeared, upon the cross-examination of this juror, on his *voir dire,* that he had served on a jury in a capital case in another state, and that, as a result of the verdict of that jury, the defendant was dead.   Defendant complains of the action of the trial court in not sustaining his challenge of the witness for implied bias.   In support of this challenge, counsel

cite paragraph 5 of section 5473 of Wilson's Revised and Annotated Statutes of Oklahoma of 1903, which provides that a challenge for implied bias may be made against a juror for "having served on a trial jury which has tried another person for the offense charged in the indictment." As counsel strenuously insist in their brief that it was reversible error for the court to overrule this challenge, we will call their attention to the fact that, if they are correct, it would disqualify every man from jury service in a murder case who had ever served on the jury in any other murder case. To our minds it is clear that the Legislature never intended to produce any such result. The evident purpose was to disqualify those persons from sitting as jurors in a case who had previously sat as jurors trying some other person for the same identical offense. The court, therefore, did not err in overruling the challenge made. But, let this be as it may, defendant cannot complain, because this juror was afterwards peremptorily challenged by defendant, and the record does not show that any incompetent juror was forced on defendant by virtue of his having been forced to exhaust a peremptory challenge upon the juror Willis. Error in overruling a proper challenge to a juror, only becomes ground for reversal when the defendant is forced to use one of his peremptory challenges on said juror, and the record shows that the defendant exhausted all of his peremptory challenges, and, that by reason of his having been forced to do this, an incompetent juror was forced upon him.

This question has been repeatedly before appellate courts. In *Hudson v. State,* 28 Tex. App. 323, 13 S. W. 388, the court said:

"It was error to refuse to stand the juror aside; but the error becomes harmless in view of the fact that the juror did not sit upon the case, the defendant having rid himself of him by a peremptory challenge, and no objectionable juror having set upon the case."

The following Texas cases are to the same effect: *Holt v. State,* 9 Tex. App. 571; *Myers v. State,* 7 Tex. App. 653; *Grissom v. State,* 8 Tex. App. 386; *Hollis v. State,* 8 Tex. App.

620; *McKinney v. State,* 8 Tex. App. 626; *Cook v. State,* 8 Tex App. 659. As the Texas Court of Criminal Appeals is probably the greatest appellate criminal court in the world, we might well rest our decision of this question upon these authorities alone. We will, however, cite Thompson on Trials. In section 115, p 115, of volume 1, the author states that in some jurisdictions it is held that when a challenge for cause has been improperly overruled, and the defendant challenges the juror peremptorily, and exhausts all of his peremptory challenges on this account, there is room for the inference that the erroneous ruling may have resulted in having upon the panel other obnoxious jurors whom the party might, but for the ruling, have excluded by peremptory challenges; and then says:

"But others take what seems to be the better view, that it must also appear, not only that his peremptory challenges were exhausted, but that some objectionable person took his place on the jury, who otherwise would have been excluded by peremptory challenge."

In support of this doctrine the author then cites a great number of cases, which lay down the same rule.

Defendant further complains that his challenges for actual bias should have been sustained to the jurors Hall, Markim, and Leighton. The juror Hall had read a short sketch of the former trial in a newspaper, but formed no opinion, because he did not pay much attention to the matter, and because he had never heard what purported to be the facts of the case. If accepted as a juror he could, and would, give the defendant the benefit of the legal presumption of innocence, and would base his verdict as a juror solely upon the testimony of the witnesses and the law, as given the jury, in the instructions from the court. This is a fair sample of the testimony of the other jurors complained of. It is true that the trial court is not bound by the answers of a juror as to his bias or prejudice in the case, but may take such other steps as may be proper to ascertain the disposition of the juror towards the defendant. We see nothing in the statements of either of the jurors complained of which, of itself, would disqualify

them to sit in this case. The trial court heard their testimony, and saw their demeanor and manner of testifying, and was in a much better position to judge as to the fairness and impartiality of the jurors than this court. Our statute upon this subject is:

" Sec. 5475. In a challenge for implied bias, one or more of the causes stated in the second preceding section must be alleged. In a challenge for actual bias, the cause stated in the second subdivision of the third preceding section, must be alleged; but no person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter or cause to be submitted to such jury, founded upon rumor, statements in public journals, or common notoriety, provided it appears to the court, upon his declaration, under oath or otherwise, that he can and will, notwithstanding such opinion, act impartially and fairly upon the matters to be submitted to him. The challenge may be oral, but must be entered upon the minutes of the court."

But the enumerated causes of challenge in the statute are not exclusive of all others not enumerated. When the juror has any opinion as to the guilt of the defendant, it matters not how this opinion was formed, the closing paragraph of the statute provides that it must appear to the court that the juror can and will act fairly and impartially in the case. But if this provision was not in the statute, we would be forced to place this construction upon the first part of the statute, because section 29 of our Constitution (Bunn's Ed.) is in this language: "In all criminal prosecutions, the accused shall have the right to a speedy and public trial by an impartial jury." (Const. art. 2, § 20.) Any statute which would even tend to deprive a defendant of a trial by an impartial jury would be unconstitutional and void. Although a juror may know absolutely nothing about the facts of the case, and may not have the slightest opinion as to the guilt of the defendant, yet if from any cause or upon any ground it appears to the trial court that the juror is biased or prejudiced against the defendant, it cannot be said that he would be a fair and impartial juror, and he should be excluded from the jury:

otherwise the Constitution of the state would be disregarded
and trampled upon. The trial court should resolve all doubts
upon this matter in favor of the defendant. Upon the other
hand, when no personal, class, or race bias or prejudice appears
to exist in the mind of the juror against the defendant, but it
does appear that from rumor, or reading the public press, or
from notoriety, the juror has an opinion as to the guilt of the
defendant, but that such opinion will not combat the testimony
or resist its force, and the court is satisfied that the juror can
and will lay this opinion aside, and base his verdict alone upon
the testimony of the witnesses and the instructions of the court,
then the juror is competent. To our minds this is the only rational
construction which can be placed upon our statute.

The case of *Bradford v. Territory of Oklahoma, 2* Okla.
230, 37 Pac. 1062, is in harmony with these views. In that case
Judge Burford said:

"The first error assigned is the action of the judge of the
trial court in sustaining the challenge of the relator to certain
jurors for cause. The jurors testified, on their *voir dire,* that
they had formed opinions as to the merits of the cause, based
upon hearsay and newspaper reports, but that, notwithstanding
such opinion, they could give the defendant a fair and impartial
trial. The court excused the jurors named, and directed other
jurors to be selected to take their places. It is contended that
these jurors were not disqualified under section 5622, Criminal
Procedure, St. 1890. It is provided by said statutes that: 'No
person shall be disqualified as a juror by reason of having formed
or expressed an opinion on the matter or cause to be submitted
to such jury, founded upon rumor, statements in public journals
or common notoriety, provided it appears to the court upon his
declaration, under oath or otherwise, that he can, and will, not-
withstanding such opinion, act impartially and fairly upon the
matters to be submitted to him.' Under this section the court
must be satisfied that the juror will act fairly and impartially, and
in passing upon this question he must act judicially on the facts
before him, and the conduct and appearance of the juror; his
manner and apparent candor or impartiality are all to be con-
sidered by the court together with his action in determining his
fitness as a juror. It is the duty of the trial court, in the selec-

tion of jurors for the trial of a cause, civil or criminal, to see that jurors are obtained who will act fairly and impartially between the litigants; who will not be influenced or biased by previously formed opinions, or actuated by motives other than a desire to render exact justice to both parties. A very large discretion is vested in the court in determining the competency and qualifications of jurors, and its actions should never be disturbed by an appellate court, unless an abuse of such discretion is clearly apparent. We find nothing in the record to indicate that the trial court abused the discretion vested in it in impaneling the jury. And while it would not have been error, under the statutes cited, to have retained the jurors, as appears from their answers, the presumptions are in favor of the correctness of the act of the trial court and no error is manifest in the record. In any event, the statute cited from criminal procedure cannot be held as controlling, yet the rule there stated is the proper one, now accepted by most all the courts of the highest resort, in cases either civil or criminal."

In the case of *Huntley v. Territory,* 7 Okla. 60, 54 Pac. 314; Judge Tarsney said:

"The formation or expression of an opinion by a juror, without regard to the character of the opinion, or howsoever formed, is not a legal disqualification. It is apparent that if every opinion, of whatsoever character, and howsoever formed—whether a mere passing inclination or settled conviction in the mind—is to work a disqualification of the juror, the difficulty of obtaining intelligent jurors will be greatly increased, if not rendered absolutely impossible. One accused of crime is, by the Constitution, guaranteed a fair and impartial trial; but to insure this it is not meant that the jurors trying the case shall never have heard of the case, or shall not have any impressions concerning any of the facts, or passing inclination. This guaranty in the Constitution only excludes from the jury box those who are possessed of an opinion, upon the merits of the case, upon the guilt or innocence of the accused of the charge laid in the indictment, upon the evidence substantially as expected to be presented for the consideration of the jury on the trial of the case, or an opinion indicative of ill will toward the accused. *State v. Clark,* 42 Vt. 629. Section 25 of article 9 of the Code of Criminal Procedure is called to our attention by the Attorney General, and provides as follows: 'No person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter or

cause to be submitted to such jury, founded upon rumor, statements in public journals, or common notoriety, provided it appears to the court, upon his declaration, under oath or otherwise, that he can and will, notwithstanding such opinion, act impartially and fairly upon the matters to be submitted to him.' We are inclined to the view that this provision adds nothing to the effect of the provisions of section 22 of said article, previously quoted. If it were intended by this provision that no opinion held by a juror, however fixed and definite it might be, and though it might be indicative of ill will, should be a disqualification, if founded upon rumor, statements in public journals, or common notoriety, provided the juror should make declaration, under oath or otherwise, that, notwithstanding such opinion, he would act impartially and fairly upon the matter submitted to him, we would hesitate before saying that this statute might not be violative of the constitutional right of the accused to a trial by an unbiased jury. As we view it, the question presented in these cases is, not how, or from what sources of knowledge or information, the opinion was formed, but what is the character of the opinion, and whether it is such as to prevent the juror from determining the merits of the case unbiased by such opinion. The mere declaration of the juror, under oath or otherwise, that he can and will, notwithstanding such opinion, act impartially and fairly, cannot be made the test of his qualifications. It is 'the court, in the exercise of sound discretion,' that must determine whether the juror entertains a disqualifying opinion, and not the mere declaration of the juror himself. The formation and expression of an opinion is not alone the test of a juror's competency, but the nature of the opinion may be inquired into, and, if found to be only a transitory inclination of mind, it is not a disqualifying opinion. To work a disqualification, there must be an abiding bias of the mind, caused by substantial facts in the case, in the existence of which the juror believes; an opinion upon the merits of the case, upon the guilt or innocence of the accused of the charge laid in the indictment, upon the evidence substantially as expected to be presented on trial. Mr. Chief Justice Marshall, in *Burr's Trial* (I Burr's Trial, 416, Fed. Cas. No. 14,693), states the rule to be that: 'Light impressions, which may fairly be presumed to yield to the testimony that may be offered, which may leave the mind open to a fair consideration of the testimony, constitute no sufficient objection to a juror, but that those strong and deep impressions which close the mind against the testimony that may be offered

in opposition to them—which will combat that, testimony, and resist its force—do constitute a sufficient objection to him.' The question presented by such challenge is one of mixed law and fact, and to be tried, as far as the facts are concerned, like any other issue of that character, upon the evidence; and the trial judge must, in the exercise of a sound discretion, be satisfied from the evidence that the juror cannot try the issue impartially, without prejudice to the substantial rights of the party challenging, or the challenge should be overruled. *Reynolds v. U. S.,* 98 U. S. 145, 25 L. Ed. 244; *State v. Meaker,* 54 Vt. 112; *Scranton v. Stewart,* 52 Ind. 68; *Balbo v. People,* 80 N. Y. 484; *Cox v. People,* 80 N. Y. 500; *Baldwin v. State,* 12 Mo. 223; *Ortwein v. Com.,* 76 Pa. 414, 18 Am. Rep. 420; *People v Welch,* 49 Cal. 174; *State v. Lawrence,* 38 Iowa, 51. In *Reynolds v. U. S., supra,* Mr. Chief Justice Waite, speaking for the court, says: "The theory of the law is that a juror who has formed an opinion cannot be impartial. Every opinion which he may entertain need not necessarily have that effect. In these days of newspaper enterprise and universal education, every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits. It is clear, therefore, that upon the trial of the issue of facts raised by a challenge for such cause the court will practically be called upon to determine whether the nature and strength of the opinion formed are such as in law necessarily raise the presumption of partiality. The question thus presented is one of mixed law and fact, and to be tried, as far as the facts are concerned, like any other issue of that character, upon the evidence. The finding of the trial court upon that issue ought not to be set aside by a reviewing court, unless the error is manifest. No less stringent rules should be applied by the reviewing court in such a case than those which govern in the consideration of motions for a new trial because the verdict is against the evidence. It must be made clearly to appear that upon the evidence the court ought to have found the juror had formed such an opinion that he could not in law be deemed impartial.' "

The question of the competency of jurors is addressed to the sound discretion of the trial court, and, in the absence of an abuse of that discretion, it is not subject to review. In other

words, while the trial court must be clearly satisfied that a juror is fair and impartial before permitting him to sit in a criminal case, yet, upon appeal to this court, it must be clearly shown that the trial court abused its discretion before this court will review its rulings in this respect. We have carefully read the entire record of the examination of the jurymen summoned in this case, upon their *voir dire,* and fail to find a single instance in which the trial court ruled improperly against defendant. On the contrary, the record shows the most constant and vigilant care on the part of the court in this respect. The great majority of the jurors to whom the trial court sustained challenges for actual bias, upon the face of the record, appear to have been competent to sit in the case. If error in this respect was committed, it was at the instance of defendant, and against the protest of the state. Therefore defendant cannot be heard to complain. But the trial court saw the jurors, and their manner of testifying, and was in a better position to pass upon this question than this court is.

In view of the importance of this case, and of the further fact that the record shows that in some localities in the county there was more or less prejudice against the defendant, we desire to commend the constant, vigilant care which was exercised by the trial court in seeing that no improper juror sat in this case. It is the duty of the trial court to resolve all doubts as to the competency of a juror in favor of the defendant, which was clearly done in this case.

Seventh. Counsel for defendant complain that the court erred in permitting incompetent, irrelevant, and immaterial evidence to be given to the jury on behalf of the state, which was prejudicial to the substantial rights of the defendant, and was duly excepted to by the defendant. But, in the presentation of this ground for reversal, they failed to point out specifically the objectionable evidence. This general complaint of the action of the court in the admission of alleged incompetent evidence is altogether insufficient to present any such alleged errors in this court for consideration. But in view of the importance of this

case, and because our system of criminal jurisprudence is yet in a formative condition, we have carefully read the record over to see if any improper evidence was admitted. We have not found any ground to support the contention of defendant. On the contrary, we find that the trial judge exercised the widest latitude in behalf of defendant in this matter, and excluded evidence offered by the state, upon the objection of counsel for defendant, which should have been admitted. The state's witness, Mrs. Hinkle, testified that the deceased came from the direction where the assault had been made upon her; that she was covered from head to foot with blood; that she looked back in the direction from which she came; that she fell down, and got up and entered the yard of the witness, and sat on her porch; that this was a little after 9 o'clock in the morning; that the witness went up and had a conversation with deceased; that the blood was still flowing from wounds on her head. The witness was then asked what Mrs. Cuppy said. To this counsel for defendant objected, upon the general ground that it was incompetent, etc. The court sustained the objection. It appeared from other testimony that this was only a few minutes after Mrs. Cuppy had received the injuries which caused her death. She was then evidently fleeing from the place where the wounds had been inflicted upon her. Any statements which she may have made as to how the injuries were inflicted, and as to who inflicted them, should have been admitted as a part of the *res gestae;* and in excluding such statements the trial judge erred. But as this was done at the instance of counsel for defendant, and as it was to his benefit, he cannot be heard to complain.

Eighth. Counsel for defendant complains that the court misdirected the jury as to the matters of law; but they did not point out in what particular this was done. A general complaint is not sufficient. Were this not a capital conviction, we would dismiss this complaint without further remark; but being a capital case, we have gone over the instructions given, and we fail to find a single paragraph which does not fairly state the law applicable to the case.

Ninth. Defendant complains of the action of the trial court in not requiring the jury to return a verdict either for the state or for the defendant, upon his plea of former jeopardy. It is not necessary for this court to pass upon this question. We have held in this case that a new trial was properly granted This wiped out the former conviction, and the case stood as if it had not been previously tried. The plea of former jeopardy did not, therefore, present a defense to a second trial of defendant for this offense. It presented no issue of fact for the determination of the jury, and should have been stricken out by the court. The defendant might, with equal propriety, have requested that the action of the trial court in granting him a new trial, or that his motion to quash the indictment, or his motion for a change of judge, or his motion for a change of venue, or his motion for a continuance, should each and all have been submitted to the jury, they all presented questions of law, and were therefore for the court alone. If the plea of former jeopardy in this case had been good, upon its face, then the court should have submitted the matters of fact involved to the jury. But the plea is wholly insufficient as to matters of law, and there was therefore no question of fact for the jury. The contention of counsel for plaintiff in error is without support in reason, and is directly contrary to our statute. Section 5556, Wilson's Rev. & Ann. St. Okla. 1903, is as follows:

"A new trial is a re-examination of the issue in the same court, before another jury, after a verdict has been given. The granting of a new trial places the parties in the same position as if no trial had been had. All the testimony must be produced anew, and the former verdict cannot be used or referred to either in evidence or in argument, or be pleaded in bar of any conviction which might have been had under the indictment."

This statute was taken from the California Code. The question we are now considering came before the Supreme Court of that state in the case of *People v. Gilmore,* 4 Cal. 376, 60 Am. Dec. 620, and the court held that when a defendant had been indicted for murder and convicted of manslaughter, and a new trial, for error, was granted, he could not plead former

jeopardy, on account of such conviction, upon a second trial for the offense of manslaughter; but that he might plead former acquittal of murder, as the verdict of conviction of manslaughter was an acquittal of murder. This is followed by all subsequent cases in conrt.

Tenth. Defendant contends that the verdict is not supported by the testimony. This requires a consideration of the evidence in the case.

Mrs. Alexander was the first witness for the state. She testified that about 9 o'clock of the morning of the 23rd day of February, 1908, she saw the deceased pass her house on the public road, walking slowly, going west, and that the defendant was about 50 yards behind her, walking rapidly in the same direction; that this was about 300 yards from the place where the deceased was assaulted, and that both parties were going in that direction. This was the last seen of either party before the assault was committed. G. W. Cuppy, the next witness, identified a map, or plat of the section of the country where the assault was committed. Mrs. Heinkle testified that, a little after 9 o'clock in the morning of the assault, the deceased came to her house, covered with blood from her head to her feet; that there were wounds on her head. John Keys testified that he knew defendant; that he saw him at the home of the witness, which was near the place of the assault, eating breakfast, on the morning of the 23rd of February, 1908; that defendant was in the employment of witness. Witness identified a pair of boots as the boots of defendant; also a cap and a coat of defendant, which were introduced in evidence; also an ax handle which looked like one which had been lying around the yard of witness. Witness knew that defendant left the house of witness about 9 o'clock that morning, and, if he returned, witness did not see him. That witness was at his home when the assault was made on deceased. Dr. J. A. Walker testified that he was called to see the deceased on the morning of the 23rd of February, 1908, about 10:30 o'clock, and found her suffering from wounds on her head, some of which were made by a blunt instrument; and also there were cuts upon her head,

apparently made with a hard edged instrument; that she died from the effect of these wounds. Dr. T. E. Evans testified substantially the same as Dr. Walker. W. E. Sims testified that he was chief of police of the city of Shawnee; that on the morning of the assault made on deceased, and very soon thereafter, he went to the place of the assault; the ground was all torn up, as if there had been a struggle there, and the bushes on the side of the road were covered with blood. The ground indicated that some one had been dragged from the road. There was a club there, covered with blood. Witness identified the boots offered in evidence; he first saw them on the feet of defendant. They had mud, blood, and hair on them. One of the boots was run down. Witness saw tracks in the soft places, where the assault was made on deceased. The boots of defendant fitted these tracks. These tracks led from the place of the assault to the house where defendant lived. Witness identified a pair of overalls which defendant was wearing soon after the assault. They had fresh blood on them. Jim Pierce, a deputy sheriff, testified that he arrested defendant on the morning of the assault, in a field near the place where the assault was made, and that there was fresh blood on his nose, and eyebrows, and hair. Called the attention of defendant to the blood, and he said that he had hurt his nose in the barn that morning, and had wiped his nose and eyes with his handkerchief. His handkerchief was examined, and there was no blood on it. He asked defendant, "What did you do it for? Did you want to rob her?" He replied, "Captain, I never got a penny." The question was repeated, and the reply was, "I never got any money from her." Witness then said, "Well, if she says you are the man, she is mistaken." Defendant replied. "If she says so, I could not dispute her word." Defendant also told witness that he had been at the house all of the morning until he came to the place where he was arrested. L. A. Brown testified: Went to the place of the assault soon after the assault took place. It was all torn up; some one had been dragged from the public road down by a culvert; there was blood there, and tracks. "Defendant had blood on his face when I saw him, and there was fresh

blood all over the face of the overalls he had on, and looked soft as though it had been there only a few minutes." Defendant was taken to the place of assault and put his foot in seven or eight of the tracks there, and they fit. One of his boots was run down. The tracks led from the place of the assault to the house where defendant lived. Witness saw blood on the boots of defendant. There was also blood around his finger nails. Clifford Abbott testified to finding the mittens and pocketbook of deceased near the place where the assault was made on her. Mrs. Abbott testified: Mrs. Cuppy died on the 24th day of March; described wounds of deceased. Mrs. Loyd described condition and wounds of deceased. Mr. Harrison testified that he visited the place where deceased was assaulted, soon after; saw a broken ax handle, and indications of a scuffle there; of a body and head in the ground, and a pool of blood. Was there when defendant was brought to the place by the officer; saw fresh blood on the face and boots of defendant. Defendant said the blood on his face was on account of his hurting his nose,and the other blood on his clothes was from butchering a hog a few days before. Witness had had 25 years' experience in killing hogs. It would not have been possible for the blood on defendant's boots to have been there for two or three days, and have been in the condition it was in. The blood on his boots was fresh, and had no dirt on it. It could not have been there more than one or two hours. Mr. J. E. Abbott went to the place of the assault on the 23rd day of February, and found near there a black fascinator, which belonged to the deceased. It was soaked with blood; also found a club near there. E. A. Pierce, sheriff, went to the place of the assault about 11 o'clock on the morning that it occurred; saw deceased; she was very bloody; described place of assault as others had done. G. W. Cuppy, testified as to the condition of deceased after the assault.

State rested.

Defendant introduced, without objection, the record of former trial. Defendant testified: Was carried to place of assault; placed his foot in tracks; some of them fit his foot; some did

not. Had never been to this place before. Had never seen deceased until after assault was made. Did not make the assault on deceased. That the cap and coat in evidence belonged to John Keys. Had never seen or handled a piece of wood introduced in evidence. Had on the overalls, in evidence, on Saturday before assault when he assisted in killing a hog on John Key's place. Had on boots, in evidence, when arrested. Officers took them off. Witness identified. hair on boots, but did not know how it. came there. On the first trial, entered the plea of guilty to the charge now pending; entered this plea because he was not ready for trial, on advice of his attorney and Mr. Merrill the jailer; thought it would save his life, but was not guilty.

Defendant rested.

John Keys, in rebuttal, testified: That no hog was killed on his place on Saturday before the assault. Some days before this Saturday, the brother of the witness, assisted by two boys, butchered a hog on the place of witness. Defendant took no part in it, and was not present, but was hauling wood. He (defendant) lived on the place, and was in the employment of witness.

Joe Keys testified: Cap and coat in evidence belonged to defendant. Killed a hog on John Key's place the day before he went to McLoud. This was before assault. Defendant did not assist and was not there; but was hauling wood. No one assisted who had on boots or clothing of defendant.

Venue and a number of other minor details were proved, but the above is a brief statement of the material testimony of the case, which, in our judgment, fully sustains the verdict arrived at by the jury. We do not believe that an intelligent and honest jury could be found in the state, who, with a due regard for their oaths and the testimony, could reach any other conclusion than that defendant was guilty of a most cowardly, cold-blooded, and brutal assassination of an inoffensive old woman. The punishment inflicted by the jury is the extreme penalty of the law, but the crime committed was of appalling atrocity, and fully justified the verdict. Laws are made to be obeyed. Punishments are prescribed to be inflicted for the purpose of set-

ting an example which will deter others from committing similar offenses. The law does not punish as a matter of revenge; the purpose of punishment is the protection of society. The duty of this court ends when it finds that a defendant has been found guilty upon a fair trial before an impartial jury. Under these conditions we have no further duty, painful though it is, than to sustain the verdicts of the juries and the judgments of the courts.

After a patient investigation of the record, we find that no errors were committed prejudicial to plaintiff in error, and the judgment is in all things affirmed.

BAKER and DOYLE, JUDGES, concur.

## On Rehearing.

PER CURIAM. Rule IX. of this court, governing petitions for rehearing, is as follows:

"IX. Application for a rehearing in any cause, unless otherwise ordered by the court, shall be made by petition to the court, signed by counsel and filed with the clerk within fifteen days from the date on which the opinion in the cause is filed. Such petition shall briefly state the grounds upon which counsel relies for a rehearing, and show either that some question decisive of the case and duly submitted by the counsel has been overlooked by the court, or that the decision is in conflict with an express statute or controlling decision, to which the attention of the court was not called, either in brief or oral argument, or which has been overlooked by the court, and the question, statute or decision so overlooked must be distinctly and particularly set forth in the petition. No oral argument will be allowed on an application for a rehearing, except upon direction of the court, but if such application is granted, the cause shall be assigned for rehearing, and the clerk shall notify both parties or their counsel of the time when such rehearing will be had, and such time may be given for argument or brief as the court shall allow."

The petition for a rehearing in this case is largely a restatement of the grounds relied upon by counsel for the defendant in his assignment of errors. To this extent we will not consider the matters thus presented, as we gave these questions the

most careful and painstaking consideration when they were first submitted.

Counsel for the defendant are mistaken in stating that this court has decided, in this case, that a defendant must set out in his motion for a new trial the improper evidence admitted, and give the names of the witnesses, where evidence is complained of; and must set out, in his motion for a new trial, the specific instructions given by the trial court complained of. We believe that this would be the better practice, but we have not announced any such doctrine as applicable to the preparation of motions for new trials. In order to make this matter so plain that no one can misunderstand it, we now declare that what was said in the opinion upon this subject was limited exclusively to the presentation of such questions in this court, as ground for reversal. In this case counsel for defendant did not, in their brief or oral arguments, point out to this court a single specific error in the ruling of the trial court upon these questions. It was to this deficiency that the court was calling attention. We now repeat that general objections of this character, in this court, will not be considered unless, as was done in this case, the court, of its own motion, examines the record in detail. In considering this case, this court spent several days in trying to find out what counsel was objecting to. This labor was increased from the fact that there is no index to the record which covers 810 pages. It is the duty of counsel to have their records properly indexed, and then to point out to this court the specific errors complained of. If it is not sufficient to allege in general terms that there is error in the record, and then expect the court to find it if possible. It might as well be understood at the beginning that this court will presume that proceedings in courts of record are regular, and that the party who assails this regularity must point out clearly the specific irregularity complained of. In other words, when attorneys come before this court and seek a reversal they must be able to place their fingers upon the place that hurts. A reading of the opinion rendered will show that this court did not overlook any of the opinions of the Supreme Court of Oklahoma

Territory, but that the cases referred to in the petition for a rehearing were cited, and discussed, and distinguished from the case at bar.

Counsel are in error in stating, in their petition for a rehearing, that this court has held that the evidence in support of their plea of former jeopardy should have been stricken from the record. This court held that their plea upon its face did not present the question of former jeopardy, and that the plea, not the evidence, should have been stricken from the record, and as to the correctness of this conclusion we have no doubt.

Counsel challenge the jurisdiction of the Criminal Court of Appeals to determine this case, upon the ground that before the creation of the Criminal Court of Appeals this case had been carried by writ of error to the Supreme Court. This contention is fully answered by section 170 (Bunn's Ed.) of the Constitution, which is as follows:

"The appellate jurisdiction of the Supreme Court shall be co-extensive with the state, and shall extend to all civil cases at law, and in equity, and to all criminal cases, until a Criminal Court of Appeals, with exclussive appellate jurisdiction in criminal cases shall be established by law." (Const. art. 7, § 2.)

When the Criminal Court of Appeals was established by the Legislature, then the appellate jurisdiction of the Supreme Court in criminal cases ceased. That court then had no power to make any order in a criminal case then pending before it on appeal, except to transfer it to the Criminal Court of Appeals, as provided by law. In transferring this case, with all other criminal cases upon its docket, to this court, the Supreme Court practically held that it had lost jurisdiction of these cases, and that all appellate jurisdiction in such cases was vested exclusively in this court. This matter is too plain for argument. The statement of these things amounts to the demonstration of the jurisdiction of this court.

We are not unmindful of the awful conditions which surrounded this defendant. We do not blame his counsel for doing all in their power to save him from the consequences of his crime.

The fact that they have not been able to do so is in no manner their fault, but we could not disturb the verdict and judgment in this case without doing great violence to the laws of the state, and committing a crime against society.

Petition for rehearing denied.