# D. B. STARR v. STATE.

No. A-722.   Opinion Filed May 1, 1911.

(115 Pac. 356.)

1.   HOMICIDE—Information—Time and Place of Death. The information by a reference back to its preceding allegations sufficiently alleged the time and place of death.

2.   CRIMINAL LAW—Change of Venue—Prejudice of Populace—Requisites of Affidavit. On an application for a change of venue the affidavit of the defendant in support thereof must not only aver "that the minds of the inhabitants of the county in which the cause is pending are so prejudiced against the defendant that a fair and impartial trial cannot be had therein," but it must also set forth  the facts rendering a fair and impartial trial there improbable.

3.   APPEAL—Review—Change of Venue—Denial—Discretion. The granting of a change of venue is by statute made discretionary with the court, and the appellate court will not reverse the ruling of the trial court denying an application for a change of venue, unless it is made to clearly appear that there has been such an abuse of discretion as to amount practically to a denial of justice.

4.   SAME—"Abuse of Discretion." By "abuse of discretion" is meant a clearly erroneous conclusion and judgment, one that is clearly against the logic and effect of such facts as are presented in support of the application, or against the reasonable and probable deductions to be drawn from the facts disclosed upon the hearing.

5.   CONSPIRACY—Evidence—Declarations. In a trial for murder any evidence which fairly tends to prove a conspiracy between persons to commit murder and a motive for the murder is admissible, although not tending directly to prove the murder charged, where such testimony tends to corroborate and render more credible the testimony tending directly to prove the murder charged.

6.   EVIDENCE—Declarations and Conduct of Conspirators. Where there is testimony of a conspiracy to commit a crime, and of its subsequent commission, the state may, in support and corroboration thereof, show any act, declaration, or conduct of the alleged conspirators intermediate of the conspiracy and the crime which apparently recognizes the existence of the conspiracy or reasonably indicates preparation or motive to commit the crime.

7. **APPEAL—Review—Facts Dehors the Proceeding—Proof.** Where facts dehors the proceedings in the trial of a criminal cause which may affect the regularity of such a proceeding, are alleged in the motion for a new trial, the personal knowledge of the trial judge may be relied upon in the court below, but such grounds for a new trial must be supported by competent evidence, showing the facts, and such evidence must be incorporated in the record, otherwise the action and ruling of the trial court in relation thereto cannot be reviewed upon appeal.

8. **TRIAL—View by Jury—Presence of Accused—Waiver.** Where upon the trial of a capital case a view of the place where the crime is alleged to have been committed is directed by the court upon the request of the defendant, and no demand or expression of a desire upon his part to be present at such view is made, his absence from such view is not ground for a new trial.

9. **SAME.** Where the defendant requested that the jury view the place where the alleged crime was committed, under section 6849, Snyder's Sts., providing that "when in the opinion of the court, it is proper that the jury should view the place in which the offense is charged to have been committed," etc., and the court grants this request, he waives all right to object to the order made by the court under the statute, although such right may be a constitutional one.

10. **SAME.** The provision of the Bill of Rights conferring upon the accused the right to be confronted with the witnesses against him is not disparaged by the statute (section 6849, Snyder's Sts.), which only confers upon an accused the right to waive this constitutional right or privilege. Where the statute so provides, a constitutional right or privilege may be waived by the accused.

11. **SAME—Quaere.** Quaere, whether a view by the jury in a criminal case of the place of the crime is the taking of evidence within the meaning of the constitutional provision conferring upon the accused the right to be confronted with the witnesses against him, or is only a means of enabling the jury to better understand and apply the evidence presented in court.

(Syllabus by the Court.)

*Appeal from District Court, Latimer County; Malcolm E. Rosser, Judge.*

B. D. Starr was convicted of murder, and he appeals. Affirmed.

On the 24th day of February, 1909, an information was filed in the district court of Latimer county charging, in substance, that plaintiff in error, B. D. Starr, and C. E. Thames, did kill

and murder one W. E. Cordell, and alleging that said defendants have had a preliminary examination. March 4, 1909, the defendants filed a general demurrer, which was overruled, and thereupon each of said defendants entered a plea of not guilty and requested a severance, which was granted. March 17, 1909, the case against the defendant Thames was called, and on March 19, 1909, the jury, having failed to agree, were discharged, and said cause continued. October 4, 1909, with leave of court, an amended information was filed, which, omitting the formal parts, is as follows:

"In the name and by the authority of the state of Oklahoma. Come now W. P. McGinnis, the duly qualified and acting county attorney in and for Latimer county, in the state of Oklahoma, and in his own proper person, and gives the district court of the Fifth judicial district of the state of Oklahoma, held in and for Latimer county, state of Oklahoma, begun and holden at the city of Wilburton, in said county, and state as aforesaid, on the 4th day of October, A. D. 1909, the same being the regular October, 1909, term thereof, to know and be informed, and to understand, that one B. D. Starr, C. E. Thames, and certain other evil-disposed persons who are to the county attorney unknown, did, in Latimer county, and in the state of Oklahoma, on or about the 22d day of December, A. D. 1908, and anterior to the presentment hereof, commit the crime of murder, and that the said defendants B. D. Starr and C. E. Thames have had a preliminary examination before C. R. Hunt, an examining magistrate in and for Wilburton township, in said county and state, and that said crime was committed in the manner and form as follows, to wit: That on the date aforesaid, and in the county and state aforesaid, the said defendant B. D. Starr, C. E. Thames, and other evil-disposed persons whose names are to the county attorney of said county and state aforesaid unknown did then and there feloniously, without authority of law, and with a premeditated design to effect the death of one W. E. Cordell, then and there being, then and there with some kind of gun or pistol which is to the county attorney aforesaid unknown, and then and there in the hands of them, the said B. D. Starr, C. E. Thames, and certain other evil-disposed persons had and held, the same being then and there loaded and charged with gun-

powder and leaden balls, shoot and discharge leaden bullets into the body of him, the said W. E. Cordell, then and there, and thereby inflicting upon the body of him, the said W. E. Cordell, a mortal wound, of which mortal wound he, the said W. E. Cordell, then and there, on the 24th day of December, A. D. 1908, did die, and that they the said defendants, B. D. Starr, C. E. Thames, and certain other evil-disposed person who are to the county attorney aforesaid unknown, in the manner and form and by the means aforesaid, feloniously, without authority of law, and with a premeditated design to effect the death of him the said W. E. Cordell; contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the state of Oklahoma."

October 5, 1909, the defendants filed a demurrer, which was overruled and exceptions allowed. Thereupon each of said defendants entered a plea of not guilty. Thereupon plaintiff in error filed his verified application for a change of venue upon the ground "that there is a prejudice existing in this county against the said defendant, but that the same is without any just cause, and that said prejudice prevails generally throughout the county, and especially among such citizens as compose the juries of the said county, that this defendant has considerable acquaintance with the citizens of this county, and this defendant states that a fair and impartial trial of the said defendant by a jury cannot be had by the said defendant herein in the county of Latimer by reason of such prejudice existing against the said defendant in said county. Wherefore your petitioner prays that an order be made removing said cause to some other county in the Fifth district for trial." Attached to said motion was a notice to the county attorney and proof of service of the same on the 4th day of October, 1909. The application was supported by 12 affidavits wherein each affiant states:

"I verily believe and know that the defendant, B. D. Starr, cannot have a fair and impartial trial in the said county of Latimer, because the minds of the inhabitants of said county in which said cause is pending are so prejudiced against the defendant that a fair and impartial trial cannot be had therein."

The county attorney introduced seven controverting affiants. October 5th a hearing was had and the motion for a 'change of venue was overruled. The cause was set for trial October 11th, and the court ordered a special venire of '40 jurors. October 11th the defendant filed a motion to set aside the special venire of jurors summoned to try the case, which motion was overruled by the court, and thereupon the defendant renewed his motion for a change of venue, which was overruled, and the defendant, Starr, thereupon demanded a severance, which was granted. October 12, 1909, the cause was called for trial, and on October 14th the jury returned a verdict finding the defendant guilty of murder, and assessed his punishment at imprisonment for life. Motions for new trial and in arrest of judgment were filed. October 20, 1909, said motions were overruled and judgment and sentence in accordance with the verdict was pronounced and entered. An appeal was taken by filing with the clerk of this court on April 13, 1910, a petition in error with case-made attached.

It appears from the record that on the 22d day of December, 1908, about 8 o'clock p. m., in the engine room at mine No. 1, of the Haley-Oklahoma Coal Company, near Lutie, C. E. Cordell (commonly called Ned Cordell), a fire runner, was fatally shot while changing his clothes in the engine room. Then and there present were John Dameron, the engineer, and the defendants B. D. Starr (generally known as Bandy Starr) and C. E. Thames. Lutie, in Latimer county, is two miles east of Wilburton. The coal strata there do not lie horizontally, but dip diagonally. Coal there is mined generally by an opening from where it out-crops, which method is called "slope mining." Mine No. 1 is a slope mine, and at the opening of the slope was an engine house, a boiler house, and a compressor. The compressor and the hoisting machinery make a great deal of noise when in operation. In front of the engineer is an indicator that shows at what point in the slope the cage is at any particular moment. The engine house had

two doors, one leading from the engine room into the boiler room, and the other into the room where the compressor was.

John Dameron, the first witness for the state, in substance, testified that he was engineer at mine No. 1, where the deceased was a fire runner; that on the evening of December 22d John Wynn, who worked for the defendant Starr, came to the engine room and asked for Ned Cordell. Shortly after the defendant Thames came to the boiler room, and there inquired for Cordell, in the presence of Jim Woods, the fireman. The record then shows his testimony as follows:

"Q. Just relate to the jury what occurred between you and Mr. Thames and Mr. Woods when Thames was there in the engine, I mean the boiler, room. A. Why, when I walked into the boiler house, Mr. Thames was standing in there, and he was asking about Ned. I forget whether he asked me or Jim where Ned was, and I said, 'Just gone down, but he will be out in a short time, an hour or so, something like that'; and I don't know whether I asked him what he wanted with Ned or not, but then he said he wanted to see Ned, that he heard he was going to Ft. Smith, and I said, 'Yes; I heard he was going to Ft. Smith to-morrow morning.' 'Well', he said, 'I have not ordered any Christmas booze yet.' 'And,' he says, 'Bandy and I were thinking of sending for some booze by him.' And I said, 'I will tell him to come pass the pool hall. Usually you can see him down there after he comes out.' And he said, 'All right,' and then I went on duty."

He was further asked:

"Q. Now, when did you next see Thames that night? A. Well, I seen Thames the next time at the track very near the company's store. Q. What occurred there? A. Why, I just spoke, and said, 'Hello, Mr. Thames,' and he said 'Hello,' and asked me where I was going, and I told him that I was going up to see Cook, who got hurt that day, and he said 'Hurry back,' that he had just sent a fellow after a pint of whisky, and I said, 'I will be back pretty soon,' and he said, 'We are going to the engine house, too,' and he asked me if Ned was up yet, and I said Ned was washing or fixing to wash when I left,"

—that he was gone about half an hour from the engine house,

and, when he went back, he found Mr. McDowell, the timberman, John Humphries, the rope rider, and three or four foreigners, Bandy Starr, Thames, and Ned Cordell; that the foreigners, rope rider, and timberman were there going to work down in the slope, and, after they went down, there was left Thames, Starr, Ned Cordell, and the witness; that Thames was standing right behind where he was sitting, and Starr a little to the right behind him. He was then asked:

"Q. After you started the trip down, tell the jury in your own way just what you saw and what occurred    A. After the trip started down? Well, after the trip started down, why, I sat looking north and ran along slow. I had to trip the men on, and had not run very far, had not run more than a lift and a half, between two and three, where the trip was on, till the shot was fired, and I looked—I just jumped and looked to my left, looked around like that, and I saw a man over by the stove throwing up his hands, and falling back like that. Q. Who was that man? A. Ned Cordell. Q. Go ahead. A. And I then turned back and put on my brake, and stopped my engines, and threw her up on the center. Of course, I did that in very quick time; and I then jumped off the platform on the left-hand side, and ran over between the stove and the cylinder, right close to Ned's feet, where he had fallen, and I then took a glance around the engine house, and ran out through the compressor room. Q. When you ran through the compressor room, were you going away from or going by those two men? A. Did I go by them as I went out? Why, they were on that side, and I went out this way. Q. When you heard that shot did you see any flame? A. I saw a flash; yes. Q. Where was that? A. It seemed to be kind of behind my chair, and it looked a little bit above my head. Q. You were sitting down? A. Yes, sir; and that's the way it looked to me. Q. Where did the sound of that shot come from? A. Well, it sounded to me like it was right behind me some place. It sounded to me like it was right there behind me. Q. Right there behind you. When you looked towards the door after coming to Cordell, what men did you see in that room, if any? A. Why there was Starr, Thames, and myself. Q. Was there any one but you and Starr and Thames? A. No."

He further testified that he immediately stopped the engine

and ran over to Cordell, and then out to the boiler room, and called Woods to come and go in with him; that, when they returned, Thames and Starr were leaving the engine room; that he then phoned the officers, and told them to send a doctor; that Thames said he thought that Ned had shot himself, and Starr was looking around the windows, and asked whether the door was open or shut, and wondering where it came in at. He further testified that he had worked as engineer at mine No. 1 for about a year and a half, alternating every two weeks on the night and day shift, and never remembered seeing Starr or Thames there before after night; that Cordell was a small man about 25 years of age, weighing about 135 pounds; that Starr and Thames were about five or six feet away from him when the shot was fired, and neither of them made any effort to assist Cordell while he' was there.

J. W. Woods, the second witness for the state, testified: That he was fireman at mine No. 1. That on the day Cordell was shot his shift commenced at 3 and ran to 11 p. m. John Dameron was engineer that night. Cordell was a fire runner, and his duty was to run through all the workings of the mine to see that there was no fire after the shot fireman came out. That about 6 p. m. Cordell went to work, that just after he had gone down to his work, the defendant Thames came to the boiler house, and asked if Cordell had gone down yet. That he told him he had, and Thames said: "I would like to have seen him before he went down," that he was going to Ft. Smith the next day, and he wanted to send by him for some whisky. After staying a few minutes, he said that he was going to the pool hall, and asked witness to tell Cordell when he came out to come by the pool hall, that he and Bandy Starr wanted to see him, and also asked about when Cordell would be out, and witness answered that it generally took him about an hour and a half or two hours to make his round. That Cordell came out after 7 p. m. and Thames returned about that time with Bandy Star, and they passed through the boiler house going on into the engine house, and while passing through

one of them asked if Cordell had come out yet. A few minutes after he heard a gun shot. The report came from the direction of the engine house, and about a minute after the engineer came through the compressor room and told him some one had shot Ned Cordell. That he went with the engineer to the engine house, and found Bandy Starr and Thames standing in the southeast corner, and Ned Cordell lying unconscious in the southwest corner of the engine room. Dameron took the engine and brought the men on the trip out. Thames said he believed Cordell had shot himself. Witness then searched for a gun where Cordell was lying and on his person, but did not find any. He found that he was shot with a shotgun, and asked Thames where did the shot sound like it was from, and Thames said it sounded to him like it was out there, and pointed a little southeast of the engine, and witness told him that he knew it was not fired from there, or he would have seen it. When the men on the trip came out of the mine, Thames proposed for some of them to search him, but nobody did. Witness stayed about five minutes in the engine room with Starr, Thames, and Dameron. When the men came out of the slope, he returned to the boiler house. During this time the machinery was all running, including the air compressor and the hoisting engine, and they made a great deal of noise.

Dr. J. L. Sackett testified that he was a physician, and was called to attend Ned Cordell the night he was shot, and found him suffering from a gun shot wound in the back on the right side between the spine and the right arm, penetrating the chest wall and on the back of the arm about 25 or 30 shot striking; that Cordell died two days later, and his death was caused by this gun shot wound.

W. D. McDowell testified that he was pumpman at mine No. 1; that he went to work that evening at 7 p. m., and stopped in the engine house before going down in the mine; that while there, Bandy Starr and Thames came in, and Ned Cordell came out of the mine; that John Dameron, the engineer, was there, but left, and was gone about 15 minutes, and John Humphries

was there; that he did not hear Bandy Starr speak to Cordell, but Thames was joking with' Cordell while Cordell was washing; that he did not hear either Starr or Thames say anything about getting Cordell to bring whisky from Ft. Smith; that all present except Dameron, Starr, and Thames started on the trip down into the mine about 8 o'clock, and, when the trip was about the third and fourth level, it stopped, and, after a few minutes, the trip was pulled up, and they went into the engine house, and found Dameron, Starr, and Thames there, and found Cordell lying unconscious in the southwest corner of the room; that he looked around, and found a gun wad on the floor east of him; that there were several shot in the wall that ranged from the direction of the engine seat. Starr said nothing as to how the shooting occurred. Thames said that "he must have done it himself. He must have shot himself," and offered to be searched, and said that he did not have a gun. An hour later he found two or three gun wads on the floor near the engine. He was then asked: "Q. Do you know of any trouble that had existed between Ed Cordell and Bandy Starr in regard to some money that belonged to a local union? A. I did not know about it until Ned mentioned it that night." Here defendant objects because it is immaterial, irrelevant, and incompetent. The court sustained the objection. Witness further testified that the shots that struck the wall could not have come from the door, and that there was no crack large enough to put a gun barrel through.

Joe Hargis testified that he was city marshal at Wilburton, and went to the house where Cordell was carried after he was shot, and, as he was going there, saw Starr and Thames near the company's store. After staying at the house some time, on returning, he passed them again, and Starr called him and asked if Cordell had implicated any one in a statement; that he told him something that was not true. "I told him he did not." Shortly after with Buck Helton he arrested Starr and Thames, and Starr

5 Cr.—29

had two Colt pistols on him. They also arrested two of the Wynn boys.

Buck Helton testified that he arrested Starr, Thames, and the Wynns, and that Starr had two Colt pistols, a .44 and a .45 caliber, and Starr made the remark that Cordell and Thames' boys had some trouble. .

Mrs. James Woods testified, over the objection of the defendant, that she saw Mr. Thames and Mr. Cordell the Sunday afternoon before Cordell was killed, and passed them. She was then asked:

"Q. Just state what you heard? A. Well, sir, I was just passing by, and I heard Mr. Cordell say, 'Let's drop this where it is. Let's pass and repass, and let's be friendly.' And Mr. Thames said something I did not understand him, and Mr. Cordell came over again, and said, 'Mr. Thames, I did not mean to kill that boy. As sure as all three of you come on me again, I am bound to hurt some of you,' and Mr. Thames spoke up and said: 'Man, G—— d—— your soul, you will never be able to draw a gun on any of my boys.' That's all I heard, and I stepped into a neighbor's."

Whereupon the court ruled:

"Gentlemen of the jury, you are instructed in regard to the testimony of this witness you can only use it against this defendant if you believe from the other testimony that he and Thames were acting together. In other words, you will not consider it against Starr unless you believe there was some concerted action between Starr and Thames.'

The record here shows that:

"The county attorney requested the court to permit the jury to be taken to the scene of the alleged homicide so that they might view the premises, in which request counsel for defendant also joins and the court asked counsel whom they would like to accompany the jury as bailiff, and counsel for both state and defendant expressed their willingness to T. J. Williams, who had previously been sworn by the court."

On the part of the defendant the following witnesses were called, and, in substance, testified as follows:

John Humphries testified that he, with McDowell and four

foreigners, had started down into the mine on the trip; that it stopped on the slope two or three minutes, and then came up; that he went into the engine room where he had left a suit of clothes hanging on the wall; that Cordell was lying in the south-west corner of the room; that he noticed shot in the wall there, and his judgment was that they came from the east door. On cross-examination he admitted that, when he testified on the trial of the defendant Thames, he did not testify as to the direction of the shots, and that he had since become the son-in-law of the defendant Thames.

Charles Newsome testified that he was familiar with the engine house at mine No. 1, and several days after Cordell was shot he examined the shot in the wall, and that from the way it looked to him he thought the shot came from the east.

Idus Reed testified he was a cab driver in McAlester, and had formerly lived at Lutie for several months; that a short time before Cordell was killed he heard Ned Jennings, in the presence of Charles Newsome, one of the Wynn boys, and Bandy Starr, say that he would kill that G—— d—— measly son of a bitch if he did not stay away from his house and leave his wife alone, and that he thought he saw Ed Jennings down by the railroad switch the night that Cordell was shot.

Charles Newsome, recalled on the part of the defendant, testified that he heard Ed Jennings make this threat.

Jap Hawkins testified over the objection of the state that he heard Ed Jennings say about Cordell that he would kill the son of a bitch if he did not leave his wife alone.

C. E. Thames, codefendant, the next witness, took the stand, and testified, in substance as follows: That he was a coal miner, had been acquainted with Ned Cordell three or four months; that his son and Cordell had a little trouble about three weeks before Cordell's death; that at the time of Cordell's death their relations were friendly; that he did not have the conversation or make the threats testified to by Mrs. James Woods; that on the evening that Cordell was shot he left home after supper, went

to. the company's store, and there met Bandy Starr; that it was about 5 or 6 o'clock p. m.; that about 6 o'clock he went up to the engine house to see Cordell about sending by him to Ft. Smith for some whisky for Christmas, having heard that he was going to Ft. Smith the next day; that at that time Cordell was in the mine, and he did not see him that trip; that about an hour and a half later he went back with Bandy Starr, after accidentally meeting him; that they found Ned Cordell, John Dameron, McDowell, and Jim Woods at the engine house, and some foreigners on the outside; that McDowell and Humphries left after about 15 minutes, and went to the mouth of the slope; that he was unarmed, and Bandy Starr did not have any weapons; that Ned Cordell was back by a little heating stove, washing and changing clothes; that he spoke a few words to Cordell, but did not say anything to him about getting the whisky; that he was expecting to walk back to town with him, and did not care to mention it before the others; that he was standing near John Dameron, the engineer, looking at the indicator when he heard the shot fired; that Dameron was sitting on the engineer's seat near him, and that Bandy Starr was standing on the east side of the engineer, right up beside him, and that they were all facing mostly north, and that, if Starr had shot over at Cordell, he would be standing right in his way; that he could not tell where the shot came from; that he looked at Cordell; that he was falling flat on his back behind the stove against the wall; that Dameron stopped the engine and ran through the compressor room to the boiler room, and he and Starr fell back against the wall on the south side behind the air receiver; that he done this because he was afraid of another shot; that Cordell raised up and said, "Some one has shot me"; that Dameron and the fireman, Jim Woods, came back into the engine room, and Woods said, " 'Who done this,' and I said, 'I am afraid he shot himself' "; that he and Bandy Starr then left; that, after Cordell was taken to his boarding house, Starr said to him " 'The officers will be down right away. They have 'phoned for the officers, and it is likely they

will want us to look around,' and we went to Starr's house, and he got a pistol, and then we came down to John Wynn's and borrowed another one from him"; that these were the pistols that Starr had when he was arrested.

Henry Morris testified that he, with Jap Hawkins, was at Ed Jennings' house about a month or six weeks before Cordell's death, and he heard Jennings say that, if Ned Cordell did not quit fooling with his wife, he would kill the damn son of a bitch.

W. McCormick testified that he knew Ed Jennings, and that he saw him on the night Cordell was shot going towards Wilburton with a gun in his hand. On cross-examination he stated that he could be mistaken as to who the man was.

In rebuttal Henry Sims testified that he went to Ed Jennings' home with Mr. Ward on the evening of the 22d day of December, and they stayed there from 6 o'clock until 10 o'clock that evening, and Mr. Jennings was there during that time; that he heard the next day that Ned Cordell had been shot.

Golden Ward testified that he went to Ed Jennings' house with Mr. Sims. They got there about 6 o'clock and stayed until about 10 o'clock. At that time he was staying with Mr. Sims.

Joe Pebsworth testified that Ed Jennings lived in one of his houses about 100 yards from his home, which was about 2 miles from Lutie; that on the 22d of December Jennings worked for him hauling wood; that, when they quit work that evening, Jennings went home.

Mrs. Joe Pebsworth testified that she went to Ed Jennings' house on the evening of December 22d, and stayed about half an hour; that Ed Jennings was there playing with his children; that Sims and Mr. Ward and Alice Destine were there when she left.

Mrs. Ed Jennings testified that she was the wife of Ed Jennings; that Mr. Ward and Mr. Sims and Alice Destine were at her home the evening Ed Cordell was shot; that her husband came home about dark; that Mr. Sims and Mr. Ward stayed until about 10 o'clock; that the next morning she heard that Ed Cordell had been shot the night before.

Ed Jennings testified that he never made any threats to kill Cordell, and that he did not make the statement testified to by Idus Reed and Charles Newsome; that "Ned Cordell was a gentleman around about me, and was in my house several times," and he never had a missword with him; that on no occasion did he ever have any reasons to make any threats; that on the night that Ned Cordell was shot he was at his home with his family; that Mr. Sims, Mr. Ward, and Mrs. Alice Destine called that evening, and Sims and Ward remained there until about 10 o'clock. He further stated that he did not own a gun.

John W. Ridle was called, and testified that he was sheriff of Latimer county; that after the shooting of Ned Cordell he searched Bandy Starr's trunk and premises. Whereupon defendant objected as not proper rebuttal testimony, which objection was sustained by the court.

The defendant Starr did not testify.

The cause was orally argued and submitted on briefs at the March, 1911, term of this court.

*Jones & Lester,* for plaintiff in error.

*Chas. West,* Atty. Gen., and *Smith C. Matson,* Asst. Atty. Gen., for the State.

DOYLE, JUDGE (after stating the facts as above). We will consider the various assignments of error in their order as presented by plaintiff in error's brief.

The information was demurred to on several grounds: First. "For the reason that it does not state facts sufficient to constitute a crime against the defendants." It is urged that "it must be alleged in the information, not only where the deceased received the mortal wound, but also where death ensued, and that the information does not allege where said Cordell died"—citing the case of *Ball v. U. S.,* 140 U. S. 118, 11 Sup. Ct. 761, 35 L. Ed. 377. It was there held that under the Constitution and laws of the United States an indictment for murder which fails to

allege the place of death is fatally defective. Our Constitution ordains that (section 20, Bill of Rights) :

"In all criminal prosecutions the accused sh'all have the right to a speedy and public trial by an impartial jury of the county in which the crime shall have been committed. Provided, that the venue may be changed to some other county of the state, on the application of the accused, in such manner as may be prescribed by law."

The statute provides that (section 6568, Snyder's Sts.) :

"The jurisdiction of an indictment for murder or manslaughter, when the injury which caused the death was inflicted in one county, and the party injured dies in another county, or out of the state, is in the county where the injury was inflicted."

In the case of *Albright v. Territory*, 11 Okla. 497, 69 Pac. 789, Mr. Justice Hainer, after fully reviewing the authorities in conclusion, said:

"We think that the indictment sufficiently alleges that the deceased was shot and killed in Payne county; but, even if it did not, under the provisions of our organic act and the statutes of this territory, an indictment for murder is sufficient which charges that the injury which caused the death was inflicted in the county in which the prosecution is had, and it is not necessary to specifically allege the place of death. The demurrer to the indictment was therefore properly overruled."

See, also, 12 Cyc. 212, and authorities cited.

As we read it, the information here sufficiently alleges the place of decedent's death as follows: "Of which mortal wound he, the said W. E. Cordell, then and there on the 24th day of December, A. D. 1908, did die." "Then and there," read with the context, refers back to the place where he was fatally shot; that is, in Latimer county.

Second. "For the reason that said defendants have not had a preliminary examination upon the offense charged in the information." In support of this ground it is argued: "That, as the original complaint did not include 'certain other evil-disposed persons' as charged in the information, therefore a different offense is now charged." A question of this kind is properly raised

by a motion to set aside the information. This contention, however, is without a shadow of merit. The information sufficiently charges the crime of murder, and the demurrer thereto was properly overruled.

The second assignment is: "That the refusal of the trial court to so grant defendant a change of venue was a plain abuse of the sound discretion of the court." The application for a change of venue is not in proper form. The statute requires that the affidavit of the defendant must aver (section 6766, Snyder's Sts.) "that the minds of the inhabitants of the county in which the cause is pending are so prejudiced against the defendant that a fair and impartial trial cannot be had therein. Such order of removal may be made on the application of the defendant by petition, setting forth the facts verified by affidavit." The defendant's affidavit merely avers "prejudice existing among such citizens as compose the juries of said county," and contains no statement of facts rendering a fair and impartial trial improbable. The application for a change of venue was supported by the affidavits of numerous other persons in proper form, and was resisted by seven controverting affidavits. On the issue thus joined the defendant called as witnesses three of his supporting affiants, who testified as follows:

J. H. Francis, called by defendant, testified that he was a member of the jury that tried his codefendant C. E. Thames in March, which resulted in a mistrial, and that the jury in that case stood six to six; that he believed the defendant could get a fair and impartial trial like any other ordinary citizen, but that he had heard some say that the defendant ought to be tarred and feathered, and that he had heard others say that they believed the defendant was innocent.

L. G. Highsmith, postmaster at Wilburton, called by the defendant, was asked if in his opinion the defendant could get a fair and impartial trial in Latimer county. He answered, "I hardly think he could," and that this opinion was based upon what he heard people say, but could not name those people.

Mr. Poe, called by defendant, testified that he lived in Wilburton. Asked if he thought the defendant could get a fair and impartial trial in Latimer county, he answered, "No, sir; I do not." He admitted that he was the defendant's bondsman, and some of the people he talked to were those who had indemnified him to make the defendant's bond.

The state called seven witnesses as counter evidence of the truth of the application, and to show that a change of venue was not necessary to secure to the defendant a fair and impartial trial.

J. Mahan, county commissioner, and F. A. Skinner, Ben Davis, J. Mackey, William B. Fields, C. S. Hilburn, and J. Coffey, called as witnesses on the part of the state, each testified, in substance, that he did not know of any prejudice in the minds of the people of Latimer county against the defendant, and did not know any reason why Bandy Starr could not get a fair and impartial trial in Latimer county. The statute provides that in such cases the court may in its discretion grant or refuse the change of venue.

It was said by this court in the case of *Turner v. State,* 4 Okla. Cr. 164, 111 Pac. 988, that:

"The application for change of venue in a criminal cause is addressed to the sound discretion of the court, and this court will not reverse the ruling of the trial court denying an application for a change of venue, unless it is made to appear that there has been such an abuse of discretion as to constitute a denial of a substantial right. When counter affidavits are introduced 'to show that the persons making affidavits in support of the application for a change of venue are not credible persons and that the change is not necessary,' it then becomes a question of fact for the court to determine upon a hearing whether the defendant's supporting affiants are credible persons within the requirement of the statute, and whether a change of venue is necessary to secure the defendant a fair and impartial trial."

See, also, *Johnson v. State,* 1 Okla. Cr. 321, 97 Pac. 1059; *Black v. State,* 3 Okla. Cr. 547, 107 Pac. 524.

By "abuse of discretion" is meant a clearly erroneous conclusion and judgment—one that is clearly against the logic and

effect of such facts as are presented in support of the application, or against the reasonable and probable deductions to be drawn from the facts disclosed upon the hearing. We believe defendant's affidavit fails to set forth facts sufficient as a basis on which to move for a change of venue, and from an examination of the affidavits and the testimony submitted to the court, and the further fact that the trial of his codefendant seven months previous in the same county resulted in a mistrial, we are clearly convinced that the ruling of the court in refusing to grant the change of venue was eminently correct, and, in so far as we can determine from the record before us, the challenge to the special venire of jurors drawn to try the cause was properly overruled.

"Third. That it was manifest error to admit the testimony of John Dameron as to a conversation which he had with C. E. Thames in the absence of B. D. Starr, defendant, just prior to the killing of W. E .Cordell, at the railroad crossing, and that it was manifest error to admit as evidence a conversation between C. E. Thames and Jim Woods at the engine house just prior to the killing of W. E. Cordell, and in the absence of defendant B. D. Starr, and it was error to admit the testimony of Mrs. Laura Woods as to a conversation alleged to have taken place between C. E. Thames and W. E. Cordell on Sunday evening, in the absence of B. D. Starr, and it was likewise error upon the part of the court to admit the statements of C. E. Newsome as to matters occurring in the Miners' Convention at Ft. Smith, Ark. All the above testimony was irrelevant and incompetent and immaterial because no conspiracy had ever been proved to exist between B. D. Starr and C. E. Thames to kill and murder W. E. Cordell, and none ever was shown to exist at any time in the trial."

It was the theory of the prosecution that the murder was committed by the defendants and others unknown, in pursuance of a conspiracy to kill and murder Cordell. The statement made by Thames to Dameron, "Hurry back, I have just sent a fellow after a pint of whisky, and we are going up to the engine house, too," is very significant, when we consider that as a witness for his codefendant he admits this conversation, but testifies that his

meeting the defendant Starr, a few minutes later, was accidental, and their going to the engine house together was not prearranged. Yet, he further admits that his codefendant Starr had the only whisky that was carried there by them. All the circumstances and the uncontroverted facts tend to prove that the death of Cordell was due to a conspiracy. The rule of law applicable to questions of this kind is well settled. In a trial for murder any evidence which fairly tends to prove a conspiracy between persons to commit the murder and the motive for the murder is admissible, although not tending directly to prove the murder charged in all cases, where such testimony tends to corroborate the testimony tending directly to prove the murder charged. It is not necessary that the prosecution establish beyond peradventure that the acts, declarations, or conduct of the alleged conspirators were based upon the conspiracy or in reference to the crime charged. It is sufficient if they harmonize with and tend to confirm the charge of conspiracy, or show motive for the crime. If such acts, declarations, or conduct of the alleged conspirators could not be shown, unless the motive therefor, or the connection between the same and the crime, were made undisputably clear, the range of inquiry would be very limited. It is sufficient that such acts, declarations and conduct have an apparent or probable connection with the crime.

The general rule is that where there is evidence of a conspiracy to commit a crime, and of its subsequent commission, the prosecution may in support and corroboration thereof show acts, declarations, or conduct of the alleged conspirators intermediate of the conspiracy and the crime which apparently recognizes the existence of the conspiracy, or reasonably indicates preparation or motive to commit the crime.

"Where a conspiracy is shown to exist, which is usually inductively from circumstances, then the declarations of one conspirator in furtherance of the common design, as long as the conspiracy continues, are admissible against his associates, though made in the absence of the latter. The least degree of concert or collusion between the parties to an illegal transaction makes

the act of one the act of all." (2 Wharton's Law of Evd. par. 1205.)

"Slight evidence of collusion is all that is required." (2 Rice on Evd. 865, § 333; 1 Greenleaf on Evd. [13th Ed.] § 111; *Anarchist's Case,* 122 Ill. 1, 12 N. E. 865, 17 N. E 898, 3 Am. St. Rep. 320; *Price v. State,* 1 Okla. Cr. 358, 98 Pac. 447.)

The same reasoning applies to all the testimony objected to. Our conclusion is that the testimony here objected to was clearly admissible.

The fourth, fifth, and sixth assignments are based upon the instructions given and instructions requested and refused by the court. These assignments are not supported by authorities. Nevertheless, we have carefully examined the instructions given, and we are of the opinion that they constitute a correct and complete statement of the law applicable to the facts of the case.

Seventh. Error is assigned on the alleged misconduct of counsel for the state by making the remark in the presence and hearing of the jury during the progress of the trial "that the state would show that B. D. Starr used a sawed off shotgun." The question cannot be considered by this court because it is not properly presented by the record. A careful examination of the record shows that there is nothing contained therein showing such a remark outside of the naked statement in the motion for a new trial.

Eighth. Error is assigned upon the alleged fact that the officer appointed by the court to conduct the jury to the scene of the tragedy was not sworn as prescribed by the statute. From an examination of the record, we find that it fails to sustain this contention, as it affirmatively shows that the officer appointed was duly sworn.

"Ninth. That it is error for which a new trial should be granted immediately, that the trial court accompanied the jury to the premises where it is alleged W. E. Cordell was killed, said court leaving the court room with the jury, and viewing the premises at the time the jury viewed said premises, and returning to the courtroom with the jury."

In support of this contention is cited the case of *Hays v.*

*Territory,* 7 Okla. 15, 54 Pac. 300. The case-made contains the following recitals:

"The Court: Now, gentlemen, now I suppose there are some things that will have to be said to the jury. It is the order of the court that you go and examine his place where this thing occurred. It is about two miles from here. The house will be pointed out to you. You, gentlemen, have no objection to them taking these plats? Mr. Jones: Not a bit in the world. The Court; Take these plats along with you and examine the premises as carefully as you can in that way, remembering the testimony with regard to its condition at the time of the shooting and its condition at this time. I believe a witness has testified that the windows have been taken away and canvas put up where the window was, but there has been no other change according to the testimony. In examining the premises in the light of the testimony and these plats introduced in evidence. you will not talk among yourselves there about the disputed point at all. Look at the place until you are satisfied where the various places are, but do not have any conversation among yourselves with reference to the direction the shot came from—nothing like that. Go and examine the premises, and make any examination necessary. Make an examination among yourselves without any talk about it, and, as soon as you have done that, return to the courtroom, and get back as rapidly as you can get the liveryman to bring you. [The jury left in a body at 2:30 p. m. accompanied by Judge Rosser and the bailiff and returned back into court at about 4:15, after having visited the premises.]"

The recital in brackets is all the record contains tending to show that the court or trial judge was present when the jury viewed the place where the fatal shot was fired. Upon this recital alone this assignment is predicated. No affidavit or other evidence was offered in support of this ground of the motion for new trial. We do not think this is sufficient in the absence of direct proof to the contrary, the proceedings of a court are presumed to have been regular and in due form of law, and we must presume that the court below or the trial judge was not present with the jury at the place of the homicide, or, if present, did not speak to or communicate with the jury on any subject connected

with the trial. While the personal knowledge of the trial judge may be applied and relied upon in support of a motion for a new trial in the court below, the motion must be supported by competent evidence showing the facts, and such evidence must be incorporated in the record; otherwise the action and ruling of the trial court in relation thereto cannot be reviewed upon appeal. The case of *Hays v. Territory, supra,* is not in point. There the court compelled the defendant over his objection to accompany the jury, the judges, the court stenographer, the county attorney, and counsel for the defendant to the place of the homicide, and, while viewing the place, one of the witnesses testified as to the location of certain objects and of the position of certain persons at the time of the homicide. The Supreme Court of Oklahoma Territory held this proceeding to be prejudicial error. Mr. Justice Burwell, delivering the opinion of the court, used the following language:

"These two section of our statute are decisive of the question presented. Section 5222 (section 6849, Snyder's Sts.) provides that no person can communicate with the jury on any subject connected with the trial while they are absent from the courtroom, and section 5269 (section 6896, Snyder's Sts.) provides for a new trial when the jury has received any evidence out of court other than that resulting from a view of the premises. In this case evidence was received out of court. It is true the court, and all of the court officers, attorneys for both parties, and the defendant were all present; but we do not think that a session of court can be legally held in a country place or on a public street. In our opinion it does not need the citation of authorities to support this proposition. Courthouses are built, at an enormous expense, so that the court may be held in one place. Litigants, jurors, and witnesses all know where to go under our present system, when required to be present during any litigation; but, if sessions of court can be held outside of the courthouse in one particular case, the judge can at his will change the trial of any cause or of all causes in a county to any locality to suit his own convenience. The trial court in this case cautioned all of the parties before leaving the courtroom not to talk about the case in the presence of the jury while they were out viewing the premises, and it

conducted the entire proceedings at that place. This course was possibly more prejudicial to the defendant than it would have been if defendant's counsel could have cross-examined the witness Newton at the time he gave his direct evidence in answer to questions asked him by the court. The object of sending a jury out to view the premises is to enable them to better understand the ,evidence given on the trial. Even what they see cannot be considered as original evidence."

We come now to a consideration of that which in our judgment is the most important assignment of error alleged in the petition: "That it was error to allow the jury to view the premises where the alleged killing occurred, in the absence of the defendant B. D. Starr." In support of this assignment, it is urged that, "this being a capital case, the defendant could not waive his constitutional right to be present at the proceedings under section 20 of the Bill of Rights, providing that the accused shall have the right to be confronted with the witnesses against him"—citing the cases of *Benton v. State*, 30 Ark. 328, and *People v. Bush,* 71 Cal. 602, 12 Pac. 781. When requested by the state or the defendant, it is the common practice in the courts of this country to permit the jury to visit and view the premises where it is alleged the crime was committed, when in the discretion of the court a view is deemed expedient to enable the jury to better understand and apply the evidence presented in court; such view to be conducted in the manner prescribed by the statute. There is serious conflict of authority as to whether or not the accused is entitled to be present at the view.

In the case of *Benton v. State, supra,* under the same provision of the statute, it was held that: "The defendant must be permitted to accompany the jury." Chief Justice English, delivering the opinion of the court, said:

. "By the Bill of Rights (section 10) the accused must be confronted with the witnesses against him, but the statute authorizing a view does not contemplate or permit the examination of witnesses at the view. The jury is merely to be conducted to, and shown, the place to be viewed, and the view is made by the jurors to enable them the better to understand the testimony

given by the witnesses in court; but, though no witnesses are examined at the view, yet the jurors from their observation of the place and its surroundings may receive a kind of evidence from mute things, which cannot be brought into court to confront the accused, and are in their nature incapable of cross-examination.   *   *   *   The view of the place where the crime is alleged to have been committed by the jury is part of the trial, and may be an important step in the trial, and the presence of the prisoner at the view, in a case involving life or liberty, that he may have an opportunity to observe the conduct of the jury, and whatever occurs there might be of the utmost consequence to him. The judge who presides at the trial, and hears the evidence, must determine whether or not a view be necessary; and if, in the exercise of his discretion, he deems it necessary to order the view to be made, it would be better and safer for him to accompany the jury, if convenient, to see that nothing improper occurs at the view; if not convenient, he may appoint a person to show the jury the place to be viewed, sworn as directed by statute. If the jurors are familiar with the place, they may be conducted to it by a sworn bailiff in charge of them, and there could be no necessity for the appointment of another person to show them the place. The accused should be permitted to be present at the view, and, if not on bail, should be in charge of one or more sworn officers to prevent escape."

In the case of *People v. Bush,* 68 Cal. 623, 10 Pac. 169, this case was quoted with approval, and the doctrine of the case of *People v. Bonney,* 19 Cal. 427, reversed. Says Prof. Wigmore, reviewing the reasoning of the case of *Benton v. State, supra,* and *Foster v. State,* 70 Miss. 755, 12 South. 822:

"These arguments are specious but unsound:   (1) As to the argument that the jury are receiving evidence, it is in substance sound.   To view the thing itself in issue—i. e., the premises—is undoubtedly to consult a source of proof (*ante,* pars. 1168).   But it by no means follows that the right of cross-examination is infringed.   The rule applies solely to testimonial evidence only (*ante,* paras. 1362, 1395), and no testimony is taken at a view.   The premises themselves are not witnesses.   To term them 'dumb witnesses' (as in the passage above quoted) is merely to misuse words.   The function of cross-examination, as a requirement for testimonial evidence, is to ascertain in detail

the elements of weakness that detract from the trustworthiness of a person's statement. Where human credit is not involved, cross-examination has no place. The constitutional sanction of that principal applies solely to testimonial evidence, to 'witnesses.' No one supposes that it applies to circumstantial evidence, and no one should suppose that it applies to that third source of proof, namely, autoptic preference, real evidence, or the tribunal's observation of the thing itself (*ante*, para. 1150). How could the place viewed be cross-examined? What human credit does it have that makes cross-examination necessary? The hearsay rule simply has no application to that source of proof. (2) As to the argument that the jury's view is a part of the trial and that the accused is entitled to be present at every part of the trial, the answer is that the accused might equally well claim to be present at the jury's deliberations over their verdict, for that is equally a part of the trial. If there is no inherent and invariable necessity for that part, neither is there for this. As for the related suggestion that the holding of a view in the absence of the defendant is the holding of a part of the trial 'away from the place appointed for the holding of the court,' it would follow from this that the judge and other court officers should be present also; but no one has ever supposed this necessary. It would be, on the contrary, much easier to question the propriety of the court's adjourning and traveling in a body to the place of a view, for such a proceeding would be more open to the criticism that it took the trial 'away from the place appointed for the holding of the court.' It is impossible to argue in the same moment both that the court must be held at the place appointed and that it must be held in part somewhere else. (3) As to the suggestion, based on mere general considerations of fairness and policy, that the defendant's presence is necessary because 'the jurors may receive erroneous impressions' which 'cannot be corrected or removed' and therefore the defendant should have 'an opportunity to observe the conduct of the jury and whatever occurrs there,' there are two answers: First, the defendant, though present, could not lawfully ask questions or make statements; so that the sole value of his presence would lie in the opportunity to see that nothing irregular was done and to obtain such a knowledge of what was done as would assist him in the subsequent conduct of the trial. Secondly, this very opportunity

5 Cr.—30

he already fully possesses, for he is represented at the view by a shower, selected by himself and formally appointed by the court. This shower points out such parts as the accused has directed, and does so with reference to the forthcoming testimony for that party, and this shower is in a position, not only to observe all that is done, but to make all of his observations useful later to his party as may be needed. Every practical advantage to be gained from the accused's presence is already his by virtue of the ordinary proceedings at a view; and if, in any court's practice to-day, the defendant is not allowed to have one shower appointed as his representative, then the unfairness and disadvantage in such a court arises from the improper procedure observed in the view, and not from inherent defects in the orthodox method of view. There is therefore no ground, either upon legal principle or upon practical fairness, for holding the presence of the accused himself to be essential. (4) There remains only, as a reason for allowing it, the natural desire which any accused person might have to attend the proceeding. Ordinarily, no judge (it must be supposed) could wish to disappoint such a desire, if duly expressed to him; but conceivably he might refuse to satisfy it for prudence sake, perhaps because of the danger of escape or of mob violence. Certainly no legal rule granting the right of attendance can be founded on such a consideration. In some jurisdictions it is properly maintained that the defendant is not entitled to be present at the view; but the opposite rule has been accepted in other jurisdictions." (Wigmore on Evidence, par. 1803.)

The Criminal Code of this state provides (section 6849, Snyder's Sts.) :

"When, in the opinion of the court, it is proper that the jury should view the place in which the offense was charged to have been committed, or in which any other material facts occurred, it may order the jury to be conducted in a body, in the custody of the proper officers, to the place which must be shown to them by a person appointed by the court for that purpose, and the officers must be sworn to suffer no person to speak to or communicate with the jury, nor to do so themselves, on any subject connected with the trial, and to return them into court without unnecessary delay, or at a special time."

There is no provision in the statute that the defendant shall

or may accompany the jury upon such view. It is not our purpose here, nor is it material to the determination of the case at bar, that we should attempt to lay down any definite rule of procedure under this provision of the statute further than to say that, where a defendant under the statute requests that the jury view the place, the view, if allowed by the court, should be conducted as prescribed by the statute. In making such request, the defendant thereby expressly waives the right of being present at the view. Where the view is had on the request of the prosecution or the court on its own motion directs a view, the safe practice is to permit the defendant to accompany the jury and be present, unless he expressly waives this right.

Assuming that the defendant, under the constitutional provision, had the right to be present when the view was had, the single question presented is, "Could the defendant waive this right or privilege?" The provision of the Bill of Rights that the accused shall have the right to be confronted with the witnesses against him is merely declaratory of the common-law rule requiring an opportunity of cross-examination. Generally speaking, the constitutional provisions guaranteeing to every accused person in a criminal action certain rights may be separated into two classes: First, those in which the public generally, and as a community, is interested, as well as the accused, and which are jurisdictional as affecting the power of the court to try the cause; second, those more in the nature of privileges which are for the benefit of the accused alone, and do not affect the general public. The former cannot be waived. Jurisdiction to try the cause is conferred by the law. Consent cannot confer jurisdiction, but the accused may waive a constitutional right or privilege designed for his protection, where no question of public policy is involved. The public as well as the accused have an interest in every criminal trial. The life and liberty of the citizen is a matter of supreme importance to the state, and it should not allow him to throw either away by a failure, intentional or otherwise, to take advantage of his constitutional safeguards. It will not do, however,

to say that because the state has a peculiar interest in protecting the citizen accused of crime to the extent of his constitutional rights that he shall in no case be allowed to waive them, for in some cases it may be to his interest to waive them, and the denial of the right to do so would defeat the very object in view when the rights were given, and cause them to operate to the injury rather than to the benefit of the accused. Says Mr. Bishop:

"Jurisdiction comes solely from the law, in no degree from the consent of the litigants, so that neither consent nor anything else can authorize a court to act in a cause outside the sphere which the law has ordained for it. But where the subject-matter is within the cognizance of the tribunal, and the right to take jurisdiction of it in the particular instance depends on facts *in pais*—such as the residence of parties, and others within the like reason—consent will, in the absence of any special circumstances forbidding, establish the required fact, the same as would the verdict of a jury; so that, in such case, there may be a waiver." (1 Bish. New Crim. Proc. par. 123.)

"In natural reason, one should not complain of a thing done with his consent. And the law in all its departments follows this principle. It is analogous to estoppel, or a species of it. Like any other legal doctrine, the circumstances of a particular instance may compel it to give away to another.

"If, except where some counter doctrine presses with a superior force forbidding, a party has requested or consented to any step taken in the proceedings, or if at the time for him to object thereto he did not, he cannot afterwards complain of it, however contrary it was to his constitutional, statutory, or common-law rights.

"Necessity is the chief foundation for this doctrine, without it a cause could rarely be kept from miscarrying. The mind, whether of the judge or the counsel, cannot always be held taut like a bow about to send forth the arrow; and, if every step in a cause were open to objection as well after verdict or sentence as before, a shrewd practitioner could ordinarily so manage that a judgment against his client might be overthrown. Even by lying by and watching, if he did nothing to mislead, he would find something amiss to note and bring forward after the time to correct the error had passed. Should the pleadings be right,

and only proper evidence be admitted, some question to a witness would appear in an objectionable form, or the judge would have dropped some word not absolutely square with the books, or omitted some explanation of law to the jury." (1 Bish. New Crim. Proc. pars. 117, 118, 119.)

Where a constitutional right in a criminal cause is largely for the benefit of the accused or in the nature of a personal privilege, the law is well settled that an accused may waive such right. In the case of *State v. Adams*, 20 Kan. 311, Mr. Justice Brewer said:

"So far as the provision in the Bill of Rights is concerned, there are two questions: (1) Is it anything more than the grant of certain privileges, which an accused may waive? And, where the record shows no application for the benefit of such privilege, and no refusal of the court to grant them, and no objection to any action of the court thereon, is there any error? (2) Does the sending of a jury to view the place of the alleged crime, in the absence of the defendant, trespass on any of its guaranties? First. The language is permissive. 'The accused shall be allowed' ; that is, he may have if he wishes. If he does not wish he may forego. If he does not wish, then he cannot complain that they were not forced upon him. Generally that which is a mere personal privilege, which is not essential to jurisdiction, which is not absolutely and peremptorily required by statute or public policy, may be waived. In the case of *State v. Polson*, 29 Iowa, 133, the defendant consented that a copy of the testimony given in a former trial might be read as evidence instead of an oral examination of witnesses, and he was held concluded by such consent. His right to meet the witnesses face to face he had waived. So, while he is entitled to have counsel, he is not compelled to have them. He has a right to a subpœna for his witnesses, but he is not obliged to have one issued. And the record need not show that these privileges or rights were formally tendered to him and formally declined, or that an express waiver was signed. It is enough if it does not appear that they were denied when he applied for them. So there are many other matters which his failure to object to at the time prevents his afterward complaining of. If a leading question be asked, he must object at the time, or the error is waived. If an instrument, not properly authenticated, or a deposition, be offered in evidence,

and he remains silent, he cannot thereafter complain. If to avoid a continuance he consents that an affidavit be read as the testimony of an absent witness, he is estopped to say that he did not meet the witness face to face. Documentary evidence brought from a distant state is competent testimony, notwithstanding said section 10 (*People v. Jones*, 24 Mich. 215). Contrast the language of said section 10 with that in section 207, above quoted. He 'shall be allowed.' 'No person can be tried.' The one expresses a privilege to the defendant, the other a condition of valid trial. Further, the origin of these provisions in the Bill of Rights indicates the extent to which they should be carried. It is well known that at the old common law the defendant was allowed no counsel. The judge was supposed to look after his rights. He was not allowed any witnesses in his own behalf. It was considered derogatory to the crown to contradict or impeach its witnesses. To obviate this injustice, and secure to the accused the right of a full defense, was the purpose of these provisions: That purpose is accomplished when he has the undeniable right to employ counsel and summon witnesses. We are of opinion, therefore, that the fact that the jury were sent in a body under charge of an officer to view the place of the crime, unaccompanied by the defendant, is not necessarily an error fatal to the trial, and that where the record discloses no objection thereto by the defendant, and no application for permission to accompany them, and no error alleged on account thereof in the motion for a new trial, it is too late to insist in this court that the judgment must be reversed therefor. It is unnecessary, therefore, to consider the second branch of the question as to whether it would be error if challenged by the defendant at the time."

In the case of *State v. Mortensen*, 26 Utah, 312, 73 Pac. 562, 633, Bartch, J., delivering the opinion of the court, said:

"Upon examination, it will be noticed that the right of the accused to be confronted by the witnesses against him secured by the constitutional provision above referred to falls within the class personal to the accused. It is a personal right, a personal privilege of which every defendant in a criminal proceeding may avail himself. It is limited to criminal prosecutions, and in no way affects the jurisdiction of the court to try the cause or to pass a valid judgment. Nor is the provision which secures to the accused the right in the nature of an inhibition upon a proceeding not authorized by law. Nor is it in the nature of a limitation

restraining the court from exercising its power in a place or manner prohibited by law, or without its jurisdictional limits. It is not very unlike the right which every one accused of, and being prosecuted for, a crime, has to plead guilty, and thereby waive the production of any evidence by the prosecution, and surely all agree that in such case, where a plea of guilty is entered, a court of competent jurisdiction has power to pass judgment and authorize the penalties of the law to be executed. Nor is it much unlike a case where the prosecution makes application for the continuance of a criminal cause on the ground of absent witnesses. Here the accused may admit that such witnesses, if present, would testify to the statements set out by the prosecution and consent to their use as evidence against him, and thereby secure a speedy trial. In such event, the accused consents to the use of the evidence without being confronted by the witnesses, and yet we know of no case where such action had in good faith, and not forbidden by express provision of law, was held to be in excess of the power of the court to permit. Such are simply instances, similar to the one at bar, where the accused waives his personal privilege to be confronted with the witnesses against him, and from them it seems apparent that in proper cases, where no harm can result to the accused, he may voluntarily waive his constitutional right of confrontation. The main reason for the confrontation of witnesses is to afford the accused an opportunity for cross-examination, and this is a privilege which he may waive. So when, at a trial, a prisoner sits by and permits inadmissible evidence to be received without objection, he cannot afterwards complain of the action of the court in receiving it."

In *Williams v. State,* 61 Wis. 281, 21 N. W. 56, it was said:

"It is well settled that the accused may waive his right to be confronted with the witnesses on the trial."

In *Perteet v. People,* 70 Ill. 171, it was said:

"A prisoner in a capital case is not to be presumed to waive any of his rights; but that he may, by express consent, admit them all away, can be neither doubted nor denied. He may certainly plead guilty, and thus deprive himself of one of the most valuable rights secured to the citizen, that of a trial by jury. If he can expressly admit away the whole case, then it follows that he can admit away a part of it, but he will not be presumed to have done so. The consent must be expressly shown."

In the case of *Shular v. State,* 105 Ind. 289, 4. N. E. 870,

55 Am. Rep. 211, Elliott, J., delivering the opinion of the court, said:

.  "The court on the motion of the appellant sent the jury to inspect. the premises where the homicide was committed, and did not direct that the defendant should be present when the inspection was made, but no request was made by the defendant that he should be allowed to be present; nor was there ever a suggestion to the court that he desired to accompany the jury; nor did he, although he was present when the jury left the courtroom, ask that he be permitted to go with them; nor did he object in any manner to their making the inspection.  But· the record shows more than this, for it shows that the court directed the attention of the defendant and his counsel to the statute, and stated that it required the consent of the parties,, and inquired if they consented to the order, to which inquiry, as the record recites, the defendant's counsel responded 'by renewing their request, and defendant indicated his assent.'  Many authorities are cited by counsel in support of the general principle that the defendant must be present when evidence is given against him, and that this is the general rule we have no doubt, but the question here is whether the case is within the rule, not what the general rule is.  Whether the case is within this general rule must depend upon the provisions of our statute and the conduct of the appellant.  Our statute [Rev. St. 1881, § 1827] provides that 'whenever, in the opinion of the court, and with the consent of all the parties, it is proper for the jury to have a view of the place in which any material fact occurred, it may order them to be conducted in a body, under the charge of an officer, to the place, which shall be shown to them by some person appointed by the court for that purpose.  While the jury are thus absent, no person, other than the officer and the persons appointed to show them the place, shall speak to them on any subject connected with the trial.'  This statute does not intend that the view of the premises where a crime was committed shall be deemed part of the evidence, but intends that the view may be had for the purpose of enabling the jury to understand and apply the evidence placed before them in the presence of the accused in open court.  Deferring, for the present, the consideration of the authorities, and reasoning on principle, we shall have no difficulty in concluding that the statute does not intend that an inspection of a place where a crime was committed shall be taken as evidence.  It cannot be seriously doubted that evidence can only be delivered to a jury in the criminal case in open court,

and, unless there is a judge or judges present, there can be no court. The statute does not intend that the judge shall accompany the jury on a tour of inspection. This is so obvious that discussion could not make it more plain. The jury are not, the statute commands, to be spoken to by any one save by the officer and the person appointed by the court, and they are forbidden to talk upon the subject of the trial. It is the duty of the jurors to view the premises, not to receive evidence, and nothing could be done by the defendant or by his counsel if they were present, so that their presence could not benefit him in any way, nor their absence prejudice him. The statute expressly provides who shall accompany the jury, and this express provision implies that all others shall be excluded from the right or privilege. It is quite clear from these considerations that the statute does not intend that the defendant or the judge shall accompany the jury; and it is equally clear that the view obtained by the jury is not to be deemed evidence."

· See, also, *Wills v. State*, 73 Ala. 362; *State v. Wagner*, 78 Mo. 644, 47 Am. Rep. 131; *Handcock v. State*, 14 Tex. App. 392; *Bulliner v. People*, 95 Ill. 394; *State v. Arbuno*, 105 La. 719, 30 South. 163; *State v. Handcock*, 148 Mo. 488, 50 S. W. 112; *State v. Thorn*, 156 N. Y. 286, 50 N. E. 947, 42 L. R. A. 368; *Commonwealth v. Van Horn*, 188 Pa. 143, 41 Atl. 469; *Warner v. State*, 56 N. J. Law, 686, 29 Atl. 505, 44 Am. St. Rep. 415; *State v. Reed*, 3 Idaho (Hasb.) 754, 35 Pac. 706; *State v. Moran*, 15 Or. 262, 14 Pac. 419; *Price v. U. S.*, 14 App. D. C. 391.

The Legislature cannot take away nor abridge the constitutional guarantees, nor can the courts. The Constitution is the paramount law and binds all departments of the government. A statute repugnant to the constitutional guaranties would be absolutely void; still the Legislature may provide by law for the manner of asserting and exercising those rights, and, in the absence of constitutional direction, the authorities uniformly hold that such statutes are enacted for the purpose of enforcing the constitutional right, and that they constitute a legislative construction or definition of the constitutional provision. *State ex rel. Eubanks v. Cole, District Judge*, 4 Okla. Cr. 25, 109 Pac. 736. This provision of our Criminal Code was adopted with the laws in force

in the territory of Oklahoma, if not repugnant to the state Constitution.    Section 2, Schedule.

We are of opinion that the provision of the Bill of Rights conferring upon the accused the right to be confronted with the witnesses against him is not disparaged or abridged by this provision of Criminal Procedure, which, at most, only confers upon an accused the right to waive this constitutional right or privilege.    Two things concur in this provision—the waiver by the accused and the consent of the state that an accused may make such a waiver.    Where the statute so provides, a constitutional right or privilege may be waived by the accused.

It is finally contended that the verdict is contrary to the evidence.    In this respect, we need only to state that we have set forth a full statement of the testimony in the statement of facts. The weight and credibility of the evidence were for the jury. In view of the fact that another trial is pending upon the same information, we doubt the propriety of expressing an opinion upon the evidence further than to state that the verdict rendered has our unqualified approval.

From that careful examination and consideration of the record which the consequences of a conviction of this kind demand, our conclusion is that the case has been well and fairly tried, and the defendant had a fair and impartial trial as prescribed by law.

Wherefore the judgment of the district court of Latimer county is in all things affirmed.

FURMAN, PRESIDING JUDGE, and ARMSTRONG, JUDGE, concur.