### BEN SMITH v. STATE.

No. A.-3605.    Opinion Filed Sept. 8, 1921.
(200 Pac. 553.)

(Syllabus.)

1.    Homicide—Murder—Conviction—Sufficiency of Evidence. In a prosecution for murder, the evidence examined and held to sustain a joint verdict of guilty with imprisonment for life at hard labor.

2.    Same—Conspiracy—Evidence of Acts of Conspirator. Where there is testimony tending to show community of design between two or more persons to commit a crime, the acts and declarations of one of them done and made in furtherance of the common design are admissible in evidence in a prosecution against another of the conspirators for murder committed in pursuance and in furtherance of the conspiracy, and this is the rule though such acts and declarations were not done and made in the presence of the defendant on trial.

3.   **Conspiracy—Evidence.** Where there is testimony of a conspiracy to commit a crime, and of its subsequent commission, the state may, in support and corroboration thereof, show any act, declaration, or conduct of the alleged conspirators intermediate of the conspiracy and the crime which apparently recognizes the existence of the conspiracy or reasonably indicates preparation or motive to commit the crime.

Appeal from District Court, Pittsburg County; R. W. Higgins, Judge.

Ben Smith was convicted of murder and he appeals. Affirmed.

W. H. Fuller, J. M. Porter, and J. L. Fuller, for plaintiff in error.

S. P. Freeling, Atty. Gen., and W. C. Hall, Asst. Atty. Gen., for the State.

DOYLE, P. J.   This appeal is from a judgment of conviction for murder, the punishment having been assessed at life imprisonment. The information charged that Otto Collins, Ben Smith, and J. J. Birdwell, did in Pittsburg county on the 25th day of August, 1918, kill and murder Price Jett. Upon arraignment, J. J. Birdwell demanded and was granted a severance. Appellant, Ben Smith, and the defendant Otto Collins were jointly tried and convicted of murder, the jury fixing their punishment at life imprisonment.

Motion for new trial was duly filed, overruled and judgments rendered. Appellant, Ben Smith, upon a proper application was allowed an appeal as a poor person at the expense of the county.

The principal ground urged for a reversal of the judgment is that the evidence is not sufficient to sustain the verdict and in disposing of that contention it is necessary to discuss in detail the facts and circumstances which tended to establish appellant's guilt.

Sunday morning, about half past nine on the date alleged, Price Jett and Lee Jett, his father, were shot and killed by appellant, Ben Smith, and the defendant, Otto Collins.

About a year before Price Jett had killed Jim Collins, a brother of Otto Collins; on his trial the jury failed to agree; Lee Jett had claimed that Otto Collins had shot him from ambush. The Jetts lived on a farm about four miles west of Blocker; Price Jett had a heifer that strayed. On the Friday preceding the killing, the defendant Birdwell saw the Jetts, but did not mention to them anything about knowing the whereabouts of the heifer. On Saturday, the day before the killing, Birdwell had a conversation with Otto Collins in front of the postoffice in Blocker; late in the day Birdwell rode up to the house of a man named Biggs, Ben Smith and Otto Collins were sitting on the porch and he got off his horse and went and had a conversation with them; later the same day he went to the home of the Jetts, strangers to him except he knew their names, and told Lee Jett that he knew where the lost heifer was and that he saw the heifer near his coal bank about two miles east of Blocker; he also said he would have told them on the day previous, but had forgotten about it; he then stated he wanted the Jetts to go with him the next morning and get the heifer. Lee Jett's wife did not want him to go for the heifer and Birdwell said that everything would be all right, that he had never betrayed a man in his life or got him killed; finally the Jetts agreed to go. Birdwell was seen that night in conference with Otto Collins at a Holy Roller meeting held in an arbor near Blocker. The following morning Price Jett and Lee Jett, his father, rode to the town of Blocker, where they met Birdwell, and from there they apparently started to Birdwell's coal bank to get the heifer; they went a mile east of Blocker and turned into a lane running directly south a half a mile to a mountain densely covered with timber and shrubbery; a wire gate had been placed at the south end on the Friday before the killing by Chris LeFlore, who owned the place. It

was fastened with wire loops at the top and bottom. It appears that at the time of the homicide both sides of the gate had been wired to the post by strands of barb wire; the Jetts and Birdwell rode down the lane, when the Jetts stopped at the gate they were shot by Otto Collins and Ben Smith, using high power rifles. Price Jett's body was found about a third of the way down the lane towards the road from the gate; outside of the gate near a big tree were found two high power rifle shells; directly south of the gate, near a log lying in a thicket, was found four thirty-eight empty shells. On leaving home that morning at the suggestion of his wife Lee Jett took his pistol, he had it wrapped in his coat and after the killing his coat was found tied to the saddle of his horse and a loaded pistol was found tied up in the coat. Price Jett took with him a pistol called an "Owl Head;" this gun was found by the corpse; it contained two or three shells and two or three loads; there was also a Colts automatic found by the side of his body. The evidence shows that nearby in the brush two horses had been tied, and the indications were that they had been tied there an hour or two.

Ross Bassett testified:

"I saw J. J. Birdwell and two other men ride into the lane; I was behind my house when I heard the first shots; I stepped out where I could see the lane and saw Birdwell coming up the lane on his horse and there were two men running and shooting; I walked out to the road; then the two men stopped running and seemed to be shooting down at one place; as near as I could tell the two men shooting were one on each side of the lane; four or five shots were fired before I could see who was shooting; after that there must have been fifteen or twenty. Where the men stopped and did the shooting was where I saw the corpse of Price Jett. When the shooting stopped the men walked back to the mountain; Lee Jett's body was lying near the gate; I noticed a bullet wound in his forehead and one in the back of his head; the body of Price Jett was about forty rods from the gate; I was a member of the coroner's jury."

J. J. Birdwell made a statement to the jury and said the first shot came from the brush.

Mary Bolles testified:

"I was in the house when I heard the shooting: I stepped out and saw a man on a horse running north and saw two men shooting; they were afoot and a man was running ahead of them and I saw him fall; they ran up close and kept firing their guns towards the ground about where the man fell."

Thad Coon, sheriff of Pittsburg county, testified:

"I was called and made an examination of the ground; there was a pool of blood fifteen steps north of the gate; two hundred and nineteen steps north, another pool; two hundred and thirty one steps north from the gate another pool. It was a wire gate with a loop at the bottom and one at the top for fastening and it was fastened in three places between with barb wire twisted around the posts two or three times, a bullet had entered close to the top of the post on the east side; it looked like it came from the southwest; another from the mountain in line with the big tree had cut a wire. I picked up several 38 shells near a log in the brush south of the gate; I found some shells close to the big tree and found others on the east side of the lane near the big pool of blood; I found where a horse had been tied; looked like he had stood there for an hour or two; and found a horse's tracks in the timber about two hundred yards from the gate."

Mark Harkins testified:

"I was constable at Blocker; saw Otto Collins and J. J. Birdwell talking in front of the post office about four o'clock; the next morning Birdwell came dashing up on his horse and says, 'Get your horse, there is a man killed over yonder'. I asked who did it, and he said. 'I don't know, somebody shot from the brush and the bullets whizzed right by my head.' With several others I went out there in a car; we found the body of the boy; looked like he had fell and crawled along; then we found the body of Lee Jett near the gate; I picked up two high power shells near the big tree fifteen steps south of the gate; I picked up four southwest of the gate and three along the fence close to where the body of the boy was; I also picked up

some more shells along the fence on the west side of the lane.''

Ann Jett testified:

''I am the widow of Lee Jett, and the mother of Price Jett, he was about twenty-two years old when he was killed; on Saturday me and my husband went to Crowder, and on our return, about six o'clock, found J. J. Birdwell at our place talking to the children.''

Against the defendant's objections she further testified:

''We met right near the gate and he said, 'Mr. Jett, where is your keg of Choc?' My husband said, ' I don't use any Choc,' and sorter laughed. He said, 'Mr. Jett, if I knew yesterday when you spoke to me where your heifer was, I would hove told you, but I didn't know until to-day. I came out of my coal bank and saw your heifer; she was branded ''Bar L Bar''; I got my mare and came straight here; you come and go with me tomorrow and we will get the heifer.' My husband says, 'It is according to which way she is whether I will go with you or not.' Birdwell said, 'It ain't toward your enemies, she is not that way; they keep her thrown back across the mountain'. He says, 'You come, I never betrayed a man and got him killed in my life'. Then I said, 'I ain't willing for my old man to go up there after the heifer. I will give you five dollars if you will bring him to me'. Birdwell said, ' I won't bring the heifer unless Mr. Jett goes with me.' I says, 'I will give you as much as ten dollars if you bring the heifer to me'; and Birdwell says, ' I never betrayed a man and got him killed in my life,' and said, 'Mr. Jett, come in the morning and go with me after the heifer.' He said that as much as three times. He said he lived the first or second house yon side of Mark Harkins. Nary a one of us knew who he was, but we thought he was a Kentucky man. The next morning my husband and son left on horseback. I insisted that my husband carry his gun; he put it in his coat and tied the coat to the horn of the saddle, and I said, 'You can't get that gun out of there if you need it.' ''

Annie Jett testified:

''I am the widow of Price Jett; I heard the conversation between Mr. and Mrs. Lee Jett and J. J. Birdwell; they were

on the road and I was in the lot, just the fence between us."

Against the defendant's objections she further testified:

"My husband had lost a heifer branded 'Bar L Bar' on the left side. Mr. Birdwell said, 'If he had known where the heifer was yesterday when Mr. Jett spoke to him, he would have told him, but he did not known until today, that he came out of his coal mine and saw the heifer and came right straight here.' He asked Mr. Jett to go with him to get the heifer. Mr. Jett said, 'It is according to where she is.' Mr. Birdwell said it was not towards any of his enemies, it was back the other way. Mrs. Jett said she would give him five dollars to bring the heifer to her; he said he would not unless Mr. Jett would come with him; he several times said that he had never betrayed a man and got him killed in his life. My husband was not present. The next morning, about six or seven o'clock, Mr. Lee Jett and my husband left on horseback to get the heifer."

Idas Willingham testified:

"The Interstate Coal Company has a mine two and a half or three miles east of Blocker; I am the manager; the mine is about a mile east of where the killing occurred; J. J. Birdwell worked in the mine; Thursday night before the killing the air shaft burned out and all the men were laid off Friday and Saturday except Mr. Kirkland; I didn't see J. J. Birdwell there at any time Friday or Saturday."

Otto Collins, codefendant, testified:

"I live about four miles southwest of Blocker near Tom Goodman, my father-in-law; the day before this killing I had a talk with J. J. Birdwell in Blocker and said something to him about swapping a horse and saddle for his buggy; he said he would not trade; I did not make any deal with Birdwell to get the Jetts over into that lane; on Friday, Tom Goodman told me to ride the mountain and gather his cattle; Saturday morning Ben Smith agreed to ride out the pasture with me; Holy Roller meetings were held in an arbor about a mile from my place; I went one night, Friday night; J. J. Birdwell was there; I just spoke to him; about eight o'clock Sunday morning I saddled my horse, Ben Smith got ready the same time; I took

a Winchester and an automatic; I had heard of threats by the Jetts, and the way they had done my brother I knew if I ever met them they would kill me, or I would have to kill them. We worked the mountain a couple of hours; found three head in an old pasture, and found some back from the end of the lane, and found five more upon the mountain and drove them to the end of the lane and instead of turning into the lane they drifted on east; Ben started to head them off; I saw there was a gate and I rode down to see if it was fastened up solid; I must have been 75 feet from the gate when I first saw the Jetts; Price Jett was standing at the gate; old man Jett was on his horse; he commenced shooting; I jumped off of my horse and jerked my Winchester off and began shooting; Ben hadn't commenced shooting right then, but he did just instantly after the shooting began; Price Jett was shooting; I emptied my Winchester; old man Jett fell off his horse and fired one shot after he fell; I shot at him once or twice after he hit the ground; Price Jett, after he fired one or two shots, started to run; he ran forty or fifty yards and whirled and shot back; I got over into the lane and ran up pretty close to him and he throwed his gun up, but did not shoot. I was excited and I can't tell how many shots were fired.''

Codefendant, J. J. Birdwell, testified:

''I work in a coal mine southeast of Blocker; Thursday night before the 25th, the air shaft burned out; I went out there Friday morning, to go to work, and they told me about it and laid me off; I went back Saturday morning; just drove over there and back; the mine boss told me to come back Sunday morning and he would let me know whether to go to work Monday or not; Mr. Jett had described the heifer he lost and after leaving the mine I saw this heifer; that afternoon I had a conversation with Otto Collins; he asked me how I would swap my mare and buggy for his horse and saddle, we went on up to the post office and talked a word or two about swapping; I told him we could not swap and I went home; I told my wife I would go up to Mr. Jett's and tell him about the heifer and get the five dollars reward; I drove west something like four miles to the Jett place; his little girl was on the porch and I asked her where her papa was; she said he is coming yonder from Crowder; Mr. Jett and his wife drove up to the

gate; I asked him if he had found that heifer he was hunting for; he said 'no'; I told him I thought I saw her and if he would come down I would go and show her to him; he said he would be down in the morning and I drove back home; my little boy and Mr. Crosby's took the mare and buggy and went to the Holy Roller meeting that evening; me and my wife walked over to Mr. Bigg's; I was not at the Holy Roller meeting that Saturday night; the next morning the Jetts rode to Blocker and asked me to go with them to look up that heifer; I saddled my mare and went on with them; as we got to the mouth of the little lane turning south we saw some cattle over near the south end of the lane; Jett said we would go down and look at them and come back and go to the mine, or we could go on across the mountain; Price Jett got down and opened the gate and we went on through to the south end of the lane; Price Jett got down to open the gate and said he didn't believe we could get through there; I told him we would go through; he said something I didn't understand and pulled a gun out of his pocket and fired; my pony whirled and made two or three jumps; I looked back and saw Lee Jett falling off his horse; I whipped my mare from there to the north end of the lane.''

Appellant, Ben Smith, testified:

''I am 35 years old; I have lived practically all my life around Blocker; I left Otto Collins' place with him that morning to round up some cattle for Mr. Goodman; we found three head of his cattle and turned them up the mountain; we found five head of his cattle up there and put them together; then drove them on east until we came to that lane; we were going to drive them through the lane and found it fenced up; the cattle passed by and went east; and we rode back on the mountain to look for a steer that we thought had dropped out, the first I knew that there was anyone in the lane was when a pistol popped; I jumped off my horse; Price Jett and old man Jett were shooting at me, and I was shooting too with a 38 Colts; I fired five shots and reloaded and started shooting again; while I was reloading Price Jett wheeled and shot at me; he was 40 or 50 yards up the lane then; as I went along the east side of the fence I knocked the empty shells out of

my gun; I found my horse 60 or 70 yards south of the gate, his reins were tangled over a bush.''

The testimony in this case is very voluminous, covering 1,700 pages, but the foregoing statement is sufficient to present the questions raised.

Counsel for appellant in their brief say:

''The verdict of the jury in this case can only be accounted for by reason of passion and prejudice on their part, which in our judgment grew out of the court admitting the testimony of Ann Jett, wife of Lee Jett, and Annie Jett, the wife of Price Jett, in which the state was endeavoring to show that a conspiracy existed between Birdwell, Smith and Collins to kill the Jetts, and the effect of the testimony as to what Birdwell said to the Jetts the Saturday evening before, in the absence of this defendant, and where there had been no foundation laid at the time the testimony was introduced and nothing that followed their testimony that showed or tended to show a conspiracy, was of course fatal to the defendant.''

The testimony objected to was admitted by the court under the theory of the state that the defendants on trial had conspired with their codefendant, J. J. Birdwell, to commit the crime charged. We think no error was committed in admitting the testimony of the witnesses, Ann and Annie Jett. It is true this evidence was admissible against appellant only upon the theory that all the defendants had conspired together to do an unlawful act. Conspiracies are often difficult to prove by direct testimony, and rarely can any express understanding or agreement be shown. Their existence is more often shown as in this case by the proof of circumstances, the concurrence of which leads one to believe that the parties were acting in concert with a common purpose to do an unlawful act. Large latitude is allowed necessarily in proof of a conspiracy, and the jury should be permitted to have before them all the facts which will enable them to come to a correct conclusion. The rule in such cases is well defined, and has been

announced in a number of the decisions of this court. Starr v. State, 5 Okla. Cr. 440, 115 Pac. 356; Irvin v. State, 11 Okla. Cr. 305, 146 Pac. 463.

In the last cited case this court held:

"Where there is testimony tending to show community of design between two or more persons to commit a crime, the acts and declarations of one of them done and made in furtherance of the common design are admissible in evidence in a prosecution against another of the conspirators for murder committed in pursuance and in furtherance of the conspiracy, and this is the rule though such acts and declaration were not done and made in the presence of the defendant on trial."

In the opinion it is said:

"A conspiracy can seldom be established by direct and positive evidence. It is, from the nature of the case, only evidence of circumstances tending to show conspiracy which ordinarily can be adduced. If there is testimony tending to show that the defendants pursued by their acts the same unlawful object, one performing one part and another another part of the same so as to complete it, with a view to the attainment of the same object, a sufficient and proper foundation has been laid for the admission of the acts and declarations of other conspirators made and done while the conspiracy was continuing in furtherance of the common design."

Says Wharton:

"Where a conspiracy is shown to exist, which is usually inductively from circumstances, then the declarations of one conspirator in furtherance of the common design, as long as the conspiracy continues, are admissible against his associates, though made in the absence of the latter. The least degree of concert or collusion between the parties to an illegal transaction makes the act of one the act of all." (2 Wharton's Law Ev. par. 1205.)

"Slight evidence of collusion is all that is required." (2 Rice on Ev. 865, par. 333; 1 Greenleaf on Ev. (13th Ed. par. 111.)

From all the facts and circumstances in evidence in this case it is evident that appellant and his codefendants were acting in concert with a common purpose and intent in the commission of the crime charged.

Aside from the testimony of the defendants in support of the self-defense theory, the evidence and the physical facts conclusively show that the killing of Price Jett was an assassination. His body was found riddled with bullets; his chin was shot off; a bullet entered under the left eye; another over the right ear; another back of the right ear; six or seven entered his breast and two or three his back; he was also shot through the arms, and through both legs in several places and he had been shot at least once or twice with a shotgun.

As we view it, the testimony is so conclusive as to the guilt of the defendants tried in this case that nothing can be said in their defense.

The other assignments of error are not argued in the brief, and they are not sustained by the record. Upon consideration of the whole case we are satisfied that appellant had a fair and impartial trial. His guilt or justification was a question for the jury to determine and they have determined it against him upon evidence amply sufficient to justify their verdict. The judgment of the court below is therefore affirmed.

MATSON and BESSEY, JJ., concur.